**UNITED STATES of America,**
**Appellee,**

v.

**Boris GRANIK, Alexander Iskolsky, Defendants,**

**and**

**Semyon Bumagin, Defendant–Appellant.**

**Docket No. 02–1523.**

United States Court of Appeals, Second Circuit.

Submitted: Jan. 6, 2004.

Decided: Oct. 15, 2004.

J. Scott Porter, Seneca Falls, NY, for Defendant–Appellant.

James B. Comey, United States Attorney (Harry Sandick and Adam B. Siegel,

Assistant United States Attorneys, of counsel), New York, NY, for Appellee.

Before: WINTER, JACOBS, and STRAUB, Circuit Judges.

WINTER, Circuit Judge.

Semyon Bumagin appeals from his conviction and sentence after pleading guilty before Judge Wood. Bumagin was involved in a scheme to defraud a jeweler and pled guilty to conspiring to possess and pass a counterfeit instrument to defraud a jeweler, in violation of 18 U.S.C. §§ 371, 513(a), 514(a)(2) and to passing or attempting to pass a fictitious obligation, in violation of 18 U.S.C. § 514(a)(2). In his plea agreement, Bumagin stipulated that the offenses "involved a loss or attempted loss" between $500,000 and $800,000. On appeal, Bumagin contends that the district court erred in finding that the attempted loss amount exceeded $500,000. We conclude that the district court did not err in so finding because: (i) Bumagin's stipulation was knowing and voluntary; and (ii) while the district court was not bound by the stipulation, its finding based on the stipulation was not plain error. We therefore affirm.

## BACKGROUND

a) *The Scheme*

During July 2001, Bumagin, along with Boris Granik, Alexander Iskolsky, and a confidential informant ("CI"), sought to purchase jewelry from a jeweler with a counterfeit certified bank check. According to the criminal complaint and indictment, the CI, posing as a wealthy Russian emigre, was (i) to ask the victim to bring jewelry to a hotel room at the Waldorf–Astoria in New York, and (ii) to buy "a selection" of the jewelry displayed using a counterfeit certified check. Execution of the scheme was set for July 31, 2001. All

four participants had a planning meeting on the preceding day and then met on the 31st in a car outside the Waldorf. The CI was wearing a device that recorded both meetings.

On July 31, at the direction of Bumagin, Iskolsky, and Granik, the CI called the jeweler from the car to set up a meeting outside the Waldorf. While the coconspirators sat in the car discussing the jewelry the CI would purchase, Granik told the others of the type and "costs" of the jewelry, which included one man's and one woman's watch. These "costs" totaled $590,000. Bumagin also said that the jeweler would probably "try to push his own stones," and the CI should "take fucking everything from him." Granik told the CI that if the jeweler brought extra stones she should "take them and we'll see later." Bumagin suggested that the CI ask for a second man's watch for her brother and a second woman's watch for her mother. None of the extra stones or watches was included in Granik's "costs" estimate.

Granik also forecast that the jeweler would ask the CI to pay only about half of the "cost" of each piece that the CI bought. Granik told the CI to try to bargain for an even better price by saying "if I take everything, the whole thing, can you offer me something better?" and "Can we make a deal or something?" Granik then said

> And then you'll see. If he gets fresh with you … Let's say he gives you 225 instead of 220 or watchamacallit … But if he says 210 … for the whole set … I'd know that's the lowest price … So don't squeeze him anymore.

This estimated price apparently did not include the price of a $120,000 stone, included in the $590,000 total, that the jeweler was to bring. As Iskolsky attempted to rent a hotel room at the Waldorf for the

execution of the scheme, he, Bumagin, and Granik were arrested.

b) *Indictment and Guilty Plea*

Bumagin was charged in a two-count indictment with conspiracy to possess and pass a counterfeit instrument, 18 U.S.C. §§ 371, 513(a), 514(a)(2) and passing or attempting to pass a fictitious obligation, 18 U.S.C. § 514(a)(2). Bumagin entered into a written plea agreement with the government on January 24, 2002. Bumagin agreed to plead guilty to both counts of the indictment and stipulated to the following Guidelines offense levels and adjustments: a base offense level of six, U.S.S.G. § 2F1.1 (2000); a ten level increase because the offenses involved an attempted loss between $500,000 and $800,000, *id.* § 2F1.1(b)(1)(K); a two level increase because the offenses involved more than minimal planning, *id.* § 2F1.1(b)(2); a two level increase because Bumagin was an organizer, leader, manager, or supervisor in a criminal enterprise with fewer than five participants, *id.* § 3B1.1(c); and a three level reduction for acceptance of responsibility if Bumagin's allocution was acceptable, *id.* § 3E1.1. Given these stipulations, Bumagin's adjusted offense level was 17.

Factoring in Bumagin's Criminal History Category ("CHC") of V,[1] the agreed upon offense level yielded a sentencing range of 46 to 57 months. The parties *agreed not to seek downward or upward* departures and not to ask the court to consider such departures *sua sponte.* However, the agreement allowed the government latitude

to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

Finally, the agreement included the following appellate waiver.

It is further agreed (i) that the defendant will neither appeal, nor otherwise litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the Stipulated Sentencing Guidelines range set forth above and (ii) that the Government will not appeal any sentence within or above the Stipulated Sentencing Guidelines range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation.

Bumagin consented to plead guilty before Magistrate Judge Ellis, and the plea allocution was held on January 24, 2001.

At the plea allocution, Bumagin appeared unwilling to admit that he was an organizer of the scheme. However, Bu-

---

**1.** The plea agreement also included stipulations about Bumagin's CHC that he does not challenge on appeal. Bumagin had six prior convictions, each yielding between zero and three criminal history points. Bumagin also earned points because he committed the in-

stant crimes within two years of release from imprisonment for a prior conviction and while he was on supervised release. The parties agreed that Bumagin had twelve criminal history points and a CHC of V.

magin raised no objection to any other stipulation, including the loss amount stipulation, and admitted to committing the elements of the offenses charged. Bumagin stated that he had adequate time to discuss his plea with his attorney and that he was satisfied with the attorney's representation. Bumagin also said that he understood that he would "be bound by [his] guilty plea and [would] not be permitted to withdraw it" even if his sentence was "more severe than [he] expected." In addressing the plea agreement, the court confirmed that Bumagin had discussed it with counsel, understood "what the government [was] representing in the plea agreement," and knew the sentence would be based, *inter alia,* on "the actual conduct in which [he] engaged" and "the role [he] played in the offense." In response to a question from the court about the voluntariness of the plea, Bumagin stated that he was "making this plea voluntarily, your Honor, by the big pressure, by the big moral pressure." The court did not ask Bumagin specifically about the loss amount stipulation.

At the government's request, the court questioned Bumagin about his understanding of the appeal waiver. The government asked the court to instruct Bumagin that the agreement barred him "[f]rom filing any appeal so long as he is sentenced within the stipulated guideline range." The court then told Bumagin that the stipulated guidelines range was 46 to 57 months and instructed him in the following words:

> THE COURT: Do you understand that, pursuant to the agreement, you have agreed that you will not appeal or otherwise litigate, including pursuant to Section 2255 of 28, United States Code, or Section 2241 any sentence within or below that stipulated sentencing guideline range?

> THE DEFENDANT: Excuse me one moment. (Discussion off the record between defendant and counsel)

> THE DEFENDANT: I understand, your Honor.

The magistrate judge recommended that Bumagin's plea be accepted because "[b]ased upon the defendant's allocution, while I understand that he has some concerns about the calculation, he does understand the consequences of his guilty plea. He does understand the nature of the charges. There is a factual basis for the plea, and after all of the colloquy between counsel and the Court and the defendant, he is making the plea of his own free will." Judge Wood accepted the guilty plea on January 29, 2002.

However, on April 1, 2002—about a month after the scheduled trial date—Bumagin filed a *pro se* affidavit with the court. It stated that: (i) Granik and not Bumagin was the organizer or leader of the scheme; (ii) Granik told the CI that the jewelry was worth "$200,000, retail, and not $500,000"; (iii) Bumagin and Iskolsky withdrew from the conspiracy on the morning of their arrest and intended only to buy jewelry for their children with cash; (iv) Bumagin's counsel was ineffective because counsel knew all this and did nothing about it; (v) Bumagin's counsel did not fully explain his plea agreement, even though "I am of Russian origin and my english is not very good, [and] there are a lot of legal terms that I do not fully understand because I am short on the english vocabulary"; and (vi) Bumagin requested a downward departure because his elderly mother had a "severe heart condition," his father recently died, his son was going to fight in Afghanistan leaving "no male figure in my household to provide and protect the women of my family," his daughter "may have inherited a heart condition,"

and his wife recently suffered a concussion.

c) *The PSR*

The Presentence Investigation Report ("PSR"), completed on May 16, 2002, differed in one significant respect from the stipulations set forth in Bumagin's plea agreement. It did not recommend that Bumagin receive a three level reduction for acceptance of responsibility, finding instead that he minimized his responsibility for the crime and did not "fully accept[ ] responsibility for his actions." Specifically, the PSR noted that Bumagin did not acknowledge that he was an organizer, or knew how the amount of the unwritten check was to be determined, notwithstanding the stipulations in the plea agreement. Without the acceptance of responsibility adjustment, Bumagin had an offense level of 20.[2]

Bumagin filed objections to the PSR through counsel on June 6, 2002. Bumagin argued first that he deserved acceptance of responsibility credit based on his acknowledging participation in the conspiracy to defraud. In his view, his affidavit's assertions with regard to Granik as the organizer and his own ignorance of the amount of the unwritten check did not undermine his acceptance of responsibility. Second, Bumagin requested a hearing because "[n]otwithstanding the specific terms of the plea agreement Mr. Bumagin now posits that he should not be sentenced based upon an intended loss calculation of $500,000.00." Third, Bumagin argued that he should not receive a two level increase for being an organizer/leader, also "notwithstanding the plea agreement." Finally, Bumagin requested a horizontal downward departure from Criminal History Category (CHC) V to Category III, on the

basis that his Category overrepresented the severity of his criminal conduct. The letter emphasized that Bumagin was "not seeking to have his plea vacated but rather only to have the appropriate sentence imposed."

The government argued that Bumagin was bound by the stipulations in the plea agreement and in the alternative that the stipulations in the plea agreement—to Bumagin's role, to the loss calculation, and to his CHC—were correct. Finally, the government claimed that Bumagin's post-plea statements to the probation office and the court constituted obstruction of justice and that he should therefore not receive an acceptance of responsibility adjustment and should receive points for obstruction of justice.

d) *Sentencing Hearings*

At a July 18, 2002 sentencing proceeding, Bumagin withdrew both his *pro se* affidavit and the objections to the PSR filed by counsel. Bumagin asked that the court enforce the plea agreement as written. Because Bumagin's affidavit had suggested that he had not understood his plea agreement and allocution due to language difficulties, the court conducted the proceeding through an interpreter. The court asked Bumagin about his understanding of his plea agreement and allocution. Bumagin stated that he understood everything that happened in court during his allocution and that he was satisfied with his attorney. Specifically, the judge asked: "And did you understand that by admitting each thing that you admitted during your guilty plea allocution, that you were giving up the right to contest that later?" Bumagin responded in the affirmative.

---

**2.** The PSR agreed with the plea agreement that Bumagin had a CHC of V, but found that

he had 11 rather than 12 criminal history points.

The court also discussed the proper loss calculation with the parties.[3] The government argued that the amount should be determined by the jewelry's value in a "legitimate market," while the defense countered that the legitimate market price was the price at which the jeweler would have sold it to the CI. These values corresponded to Granik's estimates, respectively, of the "costs" of the jewelry and the amount the jeweler would ask for it. The court then adjourned the sentencing conference and asked for additional briefing.

The district court sentenced Bumagin on August 14, 2002. Although Bumagin had withdrawn his objections to the PSR except for his objection to the loss of acceptance of responsibility points, the court ruled on many of them, including the objection to the loss calculation. As to that issue, the court held that "more than $500,000 in jewelry value was involved in this crime based on the statement of a codefendant as to its value and based on defendant's own stipulation to a value higher than $500,000." The court also held that Bumagin was an organizer, as evidenced by his plea agreement, his in-court statements, and the tape recordings heard by the court. The court stated that a horizontal downward departure based on

Bumagin's CHC overstating his criminal past was unwarranted.

The court noted that, based on Bumagin's post-plea affidavit and statements to the probation department, it would be within its authority to deny acceptance of responsibility points and impose obstruction of justice points. The court denied acceptance of responsibility points—thus adding three levels to the plea agreement offense level—but did not impose obstruction of justice points—which would have added an additional two levels. An offense level of 20 and a CHC of V resulted, yielding a sentencing range of 63 to 78 months. The court sentenced Bumagin to 71 months' imprisonment. In doing so, it noted that it would have sentenced Bumagin to that term if it had imposed an obstruction of justice enhancement instead of denying the acceptance of responsibility adjustment.

## DISCUSSION

On appeal, Bumagin argues that the district court erred in calculating loss amount using Granik's estimate of the jewelry's $590,000 "cost," rather than Granik's estimate of what the coconspirators would have to pay for the jewelry.[4] Although Bumagin claims that the plea agreement is

---

**3.** The court addressed the loss calculation issue, and heard argument from the parties, despite the fact that Bumagin withdrew his objection to the use of the loss amount stipulation in his plea agreement.

**4.** In a Supplemental Brief filed on August 9, 2004, Bumagin claims that his sentence violates *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). We reject this challenge under *United States v. Mincey*, 380 F.3d 102, 106 (2d Cir.2004), which held that "[u]nless and until the Supreme Court rules otherwise, the law in this Circuit remains" that the federal Sentencing Guidelines are constitutional. The mandate in this case will be held pending the Supreme Court's decision in *United States v. Booker*,

No. 04–104 2004 WL 2331491 (argued October 4, 2004). Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not reconsider those portions of its opinion that address the defendant's sentence until after the Supreme Court's decision in *Booker*. In that regard, the parties will have until fourteen days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker*.

not a sufficient evidentiary basis for calculating loss in this case, he does not ask to withdraw his guilty plea or withdraw from the plea agreement. Furthermore, Bumagin notes that he did not expressly allocute to the stipulated loss calculation at the plea proceeding. We hold that whether or not Bumagin's appellate waiver was valid, an issue we need not address,[5] Bumagin's claim as to error in the loss amount finding is meritless.

The Sentencing Guidelines specify the requirements for factual stipulations in plea agreements. According to the Guidelines, stipulations "shall," *inter alia*, "set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics" and "not contain misleading facts." U.S.S.G. § 6B1.4(a) (Policy Statement) (2000). Moreover, "[t]o the extent that the parties disagree about any facts relevant to sentencing, the stipulation shall identify the facts that are in dispute." *Id.* § 6B1.4(b) (Policy Statement); *see United States v. Telesco*, 962 F.2d 165, 168 (2d Cir.1992) (quoting U.S.S.G. § 6B1.4 and warning that prosecutors "may not compromise on factual issues when they have a good faith disagreement with the defense" or "sign a stipulation unless they have a good faith belief that the evidence supports the facts stated in the stipulation").

Although a stipulation as to the amount of loss in a plea agreement that is knowing and voluntary will generally govern the resolution of that issue, the stipulation does not fix that amount as a matter of law. It is essentially a promise by the government and the defendant not to contest the stipulated amount and to represent to the court their joint view that the amount is accurate. But the stipulation does not bind the sentencing court, and that court must find the loss amount as a fact at sentencing. *See* U.S.S.G. § 6B1.4(d) (Policy Statement) ("The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing."); *see also Telesco*, 962 F.2d at 168 (affirming court's factual finding, which differed from stipulated facts, because, *inter alia*, court was "obligated" to base finding on additional relevant information where it existed). Such a finding must be based on the record as a whole, including the affirmation by the defendant of the accuracy of the plea agreement and any other evidence before the court. *See* U.S.S.G. § 6B1.4 (Commentary) ("[T]he court cannot rely exclusively upon stipulations in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the court will consider the stipulation, together with the results of the pre-

---

**5.** Appellate waivers are generally enforceable if they are knowing and voluntary. *United States v. Monzon*, 359 F.3d 110, 116 (2d Cir. 2004). As noted, Bumagin's appellate waiver included a waiver of the right to challenge the factual stipulations in the plea agreement under any circumstances, but the court did not discuss this aspect of the waiver with Bumagin during the plea allocution, as required by the Rules. Fed.R.Crim.P. 11(b)(1) ("[T]he court must inform the defendant of, and determine that the defendant understands," *inter alia*, "the terms of any plea-agreement provision waiving the right to appeal or to

collaterally attack the sentence."). A court's failure to follow Rule 11(b) is harmless error if it "does not affect substantial rights," *id.* Rule 11(h). Because we hold that the district court's loss amount finding, based in part on Bumagin's factual knowing and voluntary stipulation, was not erroneous, we need not decide whether the district court failed to comply with Rule 11. Of course, had the waiver of appellate rights as to the loss amount stipulation been discussed during the plea allocution, the issue discussed in the body of this opinion would not have arisen.

sentence investigation, and any other relevant information.).”

Under our precedents, a stipulation in a plea agreement, although not binding, may be relied upon in finding facts relevant to sentencing.[6] For example, in *United States v. Bradbury*, the defendant pleaded guilty to conspiracy to commit kidnapping and stipulated in his plea agreement that the crime involved 378 pounds of marijuana, a circumstance that subjected him to an enhancement. 189 F.3d 200, 201–02 (2d Cir.1999). We rejected the defendant's challenge to the district court's use of this quantity for sentencing purposes, because his plea agreement “explicitly stated that the conspiracy involved 378 pounds of marijuana, and [the defendant] agreed to this amount by signing that agreement.” *Id.* at 208 n. 4; *see also United States v. Berndt*, 127 F.3d 251, 253–54, 258 (2d Cir. 1997) (affirming sentencing enhancement imposed based on factual stipulations in plea agreement, despite defendant's argument that enhancement was inapplicable). This rule simply recognizes the mutuality of plea agreements. Defendants benefit from this mutuality because the government, like defendants, is bound not to contest the substance of the plea agreement stipulations. *See United States v. Lopez*, 356 F.3d 463, 469 (2d Cir.2004) (where government stipulated to Puerto Rico drug source in plea agreement, it was unable to assert that conspiracy did not involve Puerto Rico source).

We have also frequently noted the dangers of piecemeal non-enforcement of plea agreements, albeit in the context of challenges to appellate waivers. Knowing and voluntary appellate waivers included in plea agreements must be enforced because, if they are not, “ ‘the covenant not to appeal becomes meaningless and would cease to have value as a bargaining chip in the hands of defendants.’ ” *United States v. Rosa*, 123 F.3d 94, 97–98 (2d Cir.1997) (quoting *United States v. Yemitan*, 70 F.3d 746, 748 (2d Cir.1995)); *see also United States v. Salcido–Contreras*, 990 F.2d 51, 53 (2d Cir.1993) (“In no circumstance ... may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless.”).

Like appellate waivers, factual stipulations are bargaining chips in the hands of defendants. Indeed, virtually every provision of a plea agreement—agreements not to argue for a downward or upward departure, to drop charges, to concede the defendant's role in the offense—is a bargaining chip in the hands of either the government or the defendant. Such bargaining chips can be exchanged for concessions from the other party only if they are enforceable. If defendants are not held to their factual stipulations, therefore, the government has no reason to

---

**6.** We note that in *United States v. Martinez*, 122 F.3d 421, 422–23 (7th Cir.1997), the Seventh Circuit held that the factual stipulations in the plea agreement are binding while a plea agreement remains in force. There, the defendant stipulated in the plea agreement that he was an Armed Career Criminal but appealed his sentence on the basis that he was not an Armed Career Criminal. The court held that a defendant may not opt out of selected portions of a plea agreement. Rather, a defendant may withdraw from the agreement in its entirety and go to trial, or he or she must abide by the plea agreement in its entirety. *See also United States v. Barrett*, 173 F.3d 682, 684 (8th Cir.1999) (“A defendant may not challenge an application of the Guidelines to which he agreed in a plea agreement (unless he proves the agreement invalid or succeeds in withdrawing from it).”).

make concessions in exchange for them. *See United States v. Wenger,* 58 F.3d 280, 282 (7th Cir.1995) ("Right holders are better off if they ·can choose between exercising the right and exchanging that right for something they value more highly."); *United States v. Mezzanatto,* 513 U.S. 196, 208, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) ("A defendant can 'maximize' what he has to 'sell' only if he is permitted to offer what the prosecutor is most interested in buying.").

Of course, plea agreements are " 'unique contracts,' " and we temper the application of ordinary contract principles with " 'special due process concerns for fairness and the adequacy of procedural safeguards.' " *United States v. Altro (In re Altro ),* 180 F.3d 372, 375 (2d Cir.1999) (quoting *United States v. Ready,* 82 F.3d 551, 558 (2d Cir.1996)). Plea agreements involve a waiver of constitutional and statutory rights, and for this reason, "such agreements are to be interpreted narrowly." *Rosa,* 123 F.3d at 98. For example, we have said many times that an appellate waiver is not enforceable "unless the record clearly demonstrates that the waiver was both knowing (in the sense that the defendant fully understood the potential consequences of his waiver) and voluntary." *Monzon,* 359 F.3d at 116 (internal quotation marks and citation omitted).

■ By analogy, a factual stipulation in a plea agreement is a valid basis for a factual finding relevant to sentencing only when the "record clearly demonstrates that the stipulation was knowing (in the sense that the record clearly demonstrates that the defendant fully understood the potential consequences of his [stipulation] ) and voluntary." *See id.* This test will ordinarily be satisfied where: (i) the plea agreement makes a stipulation clearly and explicitly and (ii) the defendant signs the agreement and allocutes to understanding

the consequent loss of the right to put the government to its proof. It will ordinarily not be necessary for the court taking the plea to question a defendant specifically about each factual stipulation, as it must do, for example, with appellate waivers. *See* Fed.R.Crim.P. 11(b)(1). Appellate waivers can be complicated, leading to results unexpected by defendants who do not understand them or understand them but do not foresee all their consequences. *Rosa,* 123 F.3d at 101. In contrast, binding a defendant to factual stipulations regarding a crime requires only an understanding of the obvious: facts admitted in a plea agreement can, and usually will, be accepted by the sentencing court as true.

■ Bumagin's plea agreement stated that the loss amount was between $500,000 and $800,000. His assent to the factual stipulations in the agreement, including the loss amount stipulation, was clearly knowing and voluntary. Bumagin's *pro se* affidavit contesting some stipulations in the plea agreement caused the district court to hold a hearing at which Bumagin's understanding of the agreement was fully established and at which he declined to seek a withdrawal of his plea. Bumagin withdrew both his *pro se* affidavit and his objections to the PSR, which disputed that the loss amount was over $500,000. The court also confirmed that Bumagin knew his sentence would be based on, *inter alia,* "the actual conduct in which you engaged" and "the role you played in the offense." Even on appeal, Bumagin, who has at least some university education and has lived in the United States since 1980, does not claim that he failed to read or understand the agreement or that his attorney failed to explain it to him. Rather, he argues only that the loss amount found by the district court was "excessive."

■ It is true that, as Bumagin points out, the court did not refer specifically to

the loss amount stipulation during the plea allocution. However, as noted above, a court need not address each factual stipulation during a plea allocution in order to make that factual stipulation knowing and voluntary, as long as the defendant understands that he is giving up his right to contest that stipulation.

 Of course, a district court has power to reject a factual stipulation, but there was simply no cause to do so here. Absent an appellate waiver, we have a responsibility to give some scrutiny to a district court's finding of loss amount based on a plea agreement stipulation. Where, as here, the defendant kept his end of the bargain and did not contest the loss amount stipulation at sentencing, we review the district court's findings only for plain error. *See Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) ("before an appellate court can correct an error not raised at trial, there must be" plain error). Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and citations omitted).

The district court's loss amount finding—based on both Granik's statements and the loss amount stipulation—does not constitute error, much less plain error. Indeed, because Bumagin's loss amount stipulation was knowing and voluntary, the district court could have properly found loss amount based solely on the stipulation, as long as before making its finding it considered any other relevant information presented to it, including the PSR. *See* U.S.S.G. § 6B1.4 (Commentary). Furthermore, the record as a whole contained more than ample evidence for the district court to conclude that the loss amount was between $500,000 and $800,000.[7]

## CONCLUSION

For the foregoing reasons, we hold that: (i) the stipulation as to loss amount was properly used as a basis for the district court's findings as to that amount because Bumagin's plea agreement was knowing and voluntary; (ii) plain error review applies; and (iii) the loss amount found by the district court was not plainly erroneous. We therefore affirm.

---

7. Under the Sentencing Guidelines, "loss" is "the value of the money, property, or services unlawfully taken," U.S.S.G. § 2F1.1, cmt. n. 8 (2000), in this case the jewelry the conspirators intended to "buy." Loss amount is based on the "fair market value" of stolen property. *Id.* § 2B1.1, cmt. n. 2 (2000). However, the "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant,* 128 F.3d 74, 75 (2d Cir.1997) (*per curiam*). Rather, a loss amount estimate need only be "reasonable ... given the available information." U.S.S.G. § 2F1.1, cmt. n.

9. For example, this court has approved the use of coconspirator estimates for determining loss amount. *United States v. Germosen,* 139 F.3d 120, 129 (2d Cir.1998). Similarly, here, the court was justified in relying on a coconspirator's estimate of the "cost" of the jewelry to determine loss amount. *See also United States v. Fagge,* 101 F.3d 232, 235 (2d Cir.1996) ("[T]he sentencing court remains entitled to rely on any type of information known to it when determining an appropriate sentence.") (internal quotation marks and citation omitted).