**UNITED STATES of America,**
**Appellee,**

v.

**Ali HAMDI, Defendant–Appellant.**

**No. 03–1307–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 3, 2005.

Decided: Dec. 12, 2005.

---

Donna R. Newman, Law Office of Donna R. Newman, New York, N.Y. for Defendant–Appellant.

Tracy Lee Dayton, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, on the brief; Emily Berger, Assistant United States Attorney, of counsel), Brooklyn, N.Y. for Appellee.

Before: FEINBERG, WINTER, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Defendant-appellant Ali Hamdi appeals from an April 9, 2003 judgment of sentence imposed by the United States District Court for the Eastern District of New York (Trager, J.), following his plea of guilty pursuant to a plea agreement to one count of knowingly producing without lawful authority false identification docu-

ments, in violation of 18 U.S.C. §§ 1028(a)(1) and 1028(c)(3)(A). We hold that Hamdi's completion of his sentence and subsequent removal from the United States do not render his appeal moot. We also hold that a statement in Hamdi's plea agreement that "[t]he defendant's sentence is governed by the United States Sentencing Guidelines" did not constitute a waiver of Hamdi's right to seek a remand under *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005).

## BACKGROUND

In June of 2002, the Federal Bureau of Investigation (FBI) investigated the production of fraudulent visas and identification documents at Hamdi's Brooklyn, New York, translation bureau and an associated travel agency. In connection with that investigation, Hamdi produced two fake Yemeni birth certificates for a confidential informant. After the FBI arrested Hamdi, it searched his place of business and discovered 106 purported Yemeni birth certificates that were blank. Following his indictment on multiple counts, Hamdi entered into a plea agreement with the office of the United States Attorney for the Eastern District of New York (the "Eastern District") in which he agreed to plead guilty to one count of knowingly producing without lawful authority false identification documents in violation of 18 U.S.C. §§ 1028(a)(1) and 1028(c)(3)(A), exposing himself to a statutory sentencing range of zero to fifteen years' imprisonment under § 1028(b)(1).

The plea agreement that Hamdi signed recited, *inter alia*, that "[t]he defendant's sentence is governed by the United States Sentencing Guidelines." In the same paragraph, the agreement stated that "[b]ased on the information known to the [government] at this time, the [government] estimates the likely adjusted offense level under the Sentencing Guidelines to be level 14." That calculation was based on the government's estimate, which is not explained in the record, that the offense involved between 25 and 99 false identification documents, yielding a six-level enhancement above the base offense level pursuant to U.S.S.G. § 2L2.1(b)(2)(B).[1] The government's estimated offense level resulted in a sentencing range of 15 to 21 months' imprisonment for a defendant, such as Hamdi, in criminal history category I. *See* U.S.S.G. Sentencing Table, Ch. 5, pt. A. The plea agreement warned that "[t]he Guidelines estimate set forth [above] is not binding on [the United States Attorney], the Probation Department or the Court." Hamdi's plea agreement also contained an appeal waiver providing that Hamdi would not appeal or otherwise challenge his conviction or sentence "in the event that the Court imposes a term of imprisonment of 21 months or below .... even if the Court employs a Guidelines analysis different than set forth" in the plea agreement.

On January 14, 2003, Hamdi pled guilty. On April 9, 2003, the district court sentenced Hamdi under the Guidelines principally to twenty-four months' imprisonment and two years' supervised release. The district court based this sentence on the Guidelines calculation set forth in the presentence report ("PSR"). The PSR concluded that the offense involved 108 false identification documents: the two that Hamdi prepared for the confidential informant and the 106 blanks recovered by the

1. This and future references to the Sentencing Guidelines are to the version in effect at the time of Hamdi's sentencing; this version can be found in the Guidelines Manual effective November 1, 2002.

FBI. In place of the government's estimated six-level enhancement under U.S.S.G. § 2L2.1(b)(2)(B), the district court imposed a nine-level enhancement for an offense involving 100 documents or more pursuant to § 2L2.1(b)(2)(C).[2]

While serving his sentence, Hamdi, a native and citizen of Tunisia, was placed in removal proceedings and ordered removed from the United States on the ground that he failed to comply with the terms of his nonimmigrant visa status. *See* 8 U.S.C. § 1227(a)(1)(C)(i). Hamdi has completed his criminal sentence and is now outside the United States.

## DISCUSSION

Hamdi raises only one issue on this appeal.[3] In his initial brief and at oral argument, which took place prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), he argued, relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), that the district court violated his Sixth Amendment right to a jury trial by enhancing his offense level under U.S.S.G. § 2L2.1(b)(2)(C) based on the number of documents involved in his criminal conduct without the fact of the document quantity having been admitted by him or proved to a jury beyond a reasonable doubt. After *Booker* was decided but before our decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), Hamdi amended his position by submitting an additional brief arguing that he is also entitled to remand and resentencing because the district court

sentenced him under Guidelines it regarded as mandatory. We have since categorized this kind of claim under *Booker* as one of "procedural error." *See Crosby*, 397 F.3d at 114–15. Hamdi acknowledges that his appeal is subject to plain error analysis because he did not object to his sentence on Sixth Amendment grounds below. *See* Fed.R.Crim.P. 52(b); *Crosby*, 397 F.3d at 117–18.

## I.

■ Because Hamdi has completed his sentence, we first consider whether his appeal presents a live case or controversy within the meaning of Article III of the Constitution. *See* U.S. Const. Art. III, § 2, cl. 1. In order to satisfy the case or controversy requirement, Hamdi "must have suffered, or be threatened with, an actual injury traceable to the [respondent] and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (citation and internal quotation marks omitted). Hamdi does not seek to withdraw his guilty plea, but challenges only the length of his sentence, which he has already served. His challenge to the length of his completed sentence will not satisfy the justiciability requirement of Article III unless prevailing on appeal would relieve him of some concrete and identifiable collateral effect of that sentence. *See id.* at 7, 118 S.Ct. 978; *United States v. Suleiman*, 208 F.3d 32, 36 (2d Cir.2000); *United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir.1999).

Hamdi argues that his appeal is not moot because a reduction in his sentence would have a substantial impact on his

---

2. Hamdi objected to this enhancement on several grounds that are not relevant to his claim on appeal.

3. By order dated December 17, 2003, Hamdi's original appeal of his criminal conviction was dismissed for failure to prosecute. We reinstated the appeal and appointed present counsel on December 19, 2003.

ability to obtain a discretionary waiver of inadmissibility under § 212(d)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(3). That provision grants the Attorney General discretion to admit certain otherwise inadmissible aliens as temporary, nonimmigrant visitors. *See id.* The parties agree that if Hamdi were to seek to return to the United States as a nonimmigrant visitor, the instant conviction qualifies as a "crime involving moral turpitude" that would bar his admission under INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I). This ground of inadmissibility, however, may be waived under § 212(d)(3). *See* 8 U.S.C. § 1182(d)(3)(A). In *In re Hranka,* 16 I. & N. Dec. 491 (BIA 1978), the Board of Immigration Appeals ("BIA") held that the exercise of the Attorney General's discretion under § 212(d)(3) is informed by

> essentially three factors ... weigh[ed] together[:] The first is the risk of harm to society if the applicant is admitted.

The second is the seriousness of the applicant's prior immigration law, or criminal law, violations, if any. The third factor is the nature of the applicant's reasons for wishing to enter the United States.

*Id.* at 492. Hamdi correctly notes that the length of his sentence is material to the Attorney General's assessment of both the seriousness of his criminal conviction and the risk of harm to society posed by his admission,[4] and he argues that prevailing on this appeal and receiving the potential to secure a reduced sentence will therefore substantially increase his chances of obtaining admission to the United States in the future.[5]

While it is true that a material reduction in sentence may not always reflect a judgment about the seriousness of the underlying criminal conduct and the risk that a defendant will re-offend, that is at least a primary goal of post-*Booker* sentencing.

---

4. Few precedential decisions of the BIA apply or elaborate on the *Hranka* test. In unpublished decisions, however, which may be cited, although not for precedential value, *see* BOARD OF IMMIGRATION APPEALS PRACTICE MANUAL § 1.4(d)(ii), p. 9 (2004), the BIA has considered the length of a sentence or the magnitude of a criminal fine to be indicative of the severity of an offense for purposes of its discretionary judgment under *Hranka* and § 212(d)(3). *See In re Glover,* 2004 WL 2375063, at *1 (BIA Sept. 21, 2004) (per curiam); *In re Daher,* (BIA Sept. 29, 2003) (per curiam). In fact, in almost every available recent decision of the BIA relating to the eligibility for a § 212(d)(3) waiver of an applicant with a criminal conviction, the BIA cited the sentence imposed as a relevant factor. *See In re Stirling,* 2005 WL 1766770, at *1 (BIA May 4, 2005) (per curiam); *In re Frechette,* 2005 WL 1766784, at *1 (BIA May 3, 2005) (per curiam); *In re Patel,* 2004 WL 2952124, at *1 (BIA Nov. 16, 2004) (per curiam); *In re Gagnon,* 2004 WL 2943426, at *1 (BIA Oct. 18, 2004) (per curiam); *In re Labadie,* 2004 WL 848422, at *1 (BIA Feb. 27, 2004) (per curiam). Notably, the INA itself uses the length of the sentence imposed to define a number of categories of "aggravated felon[ies]"; such aggravated felonies carry more severe consequences than similar offenses with lower sentences. *See* 8 U.S.C. § 1101(a)(43)(F), (G), (J), (Q), (R).

5. At oral argument, the government asserted that a sentence reduced under mandatory Guidelines because particular enhancements were imposed in violation of the Sixth Amendment would not reflect less serious criminal conduct, but only an automatic consequence of the evolution of Sixth Amendment jurisprudence. This argument, although responsive to Hamdi's position at that time, quite understandably failed to anticipate the nature of the remedy devised by the *Booker* Court as implemented in our *Crosby* decision. What Hamdi stands to gain on this appeal is a remand to the district court to determine whether that court would, in its discretion, and taking into account the factors enumerated in 18 U.S.C. § 3553(a), impose a materially different sentence than called for under the Guidelines. *See Crosby,* 397 F.3d at 117–18.

*See* 18 U.S.C. § 3553(a)(2)(A), (C) (stating that sentences should "reflect the seriousness of the offense" and "protect the public from further crimes of the defendant"). Prevailing on this appeal would therefore give Hamdi a chance to persuade the district court that his conduct and character did not merit a sentence of twenty-four months. In light of the BIA's practice in prior cases, *see supra* note 4, a non-trivially lower sentence would bear on two of the three relevant criteria under *Hranka* for a § 212(d)(3) waiver and would likely be interpreted by the Attorney General as indicative of less serious conduct, and of a lower risk of harm to society were Hamdi to be readmitted, than Hamdi's criminal record currently reflects.

In *Spencer v. Kemna*, the Supreme Court considered a defendant's challenge to a past parole revocation after his sentence had been completed on the ground that a successful challenge would favorably impact the exercise of discretion in a possible future application for parole. 523 U.S. at 14, 118 S.Ct. 978. The Court rejected the claim as moot, reasoning in part that the parole statute at issue gave authorities "almost unlimited discretion," so that a past violation of parole was "simply one factor among many" to be considered. *Id.* (citations and internal quotation marks omitted). The Court thus distinguished between a mere "possibility" that relief could favorably impact the parole board's discretion and a "probability" that it would. *Id.*

Similarly, in *United States v. Ben Zvi*, 242 F.3d 89 (2d Cir.2001), we declined to consider the merits of the defendant's sentencing appeal on mootness grounds. *Id.* at 99. We rejected Ben Zvi's argument that a retroactive downward adjustment of her sentence would affect the Attorney General's decision whether to grant discretionary relief under § 212(c),[6] reasoning that "[i]n light of the multitude of factors the INS judge might opt to take under consideration, the uncertainty of the weight he might decide to place on each factor, and the uncertainty as to whether he would even consider the length of the sentence imposed, ... a potential denial of § 212(c) discretionary relief is entirely too speculative and abstract for Article III standing." *Id.* Central to our reasoning in *Ben Zvi* was the wide range of adverse and positive factors the Attorney General considered when exercising discretion under § 212(c).[7] Here, because a non-trivially lower sentence would bear on two of the three *Hranka* criteria, we think a sentence reduction presents a reasonable and sufficient probability of affecting a favorable outcome in a future application for § 212(d)(3) relief to conclude that this relief is not unduly speculative or remote. *See Diaz v. Duckworth*, 143 F.3d 345, 347 (7th Cir.1998) (noting that "[a] basic principle of standing is that a person is not entitled to litigate in a federal court unless he can show a reasonable probability of

---

**6.** Prior to the 1996 amendments to the Immigration and Nationality Act, § 212(c) vested the Attorney General with broad discretion to waive deportation for deportable aliens who met certain residence requirements and had not served five years in prison for an aggravated felony. 8 U.S.C. § 1182(c) (repealed 1996).

**7.** *See Matter of Marin*, 16 I. & N. Dec. 581, 584–85 (BIA 1978). "Among the factors deemed adverse to a respondent's application [under § 212(c)] have been the nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability." *Id.* at 584. An IJ would balance these adverse factors against an even longer list of potential positive factors. *Id.* at 585.

obtaining a tangible benefit from winning" and that "[c]ertainty is not required but a remote possibility won't do").

We have previously held, in somewhat different circumstances, that "hav[ing] a chance at reentering the United States" in the discretion of the immigration authorities "is sufficient to give petitioner a personal stake in the litigation that presents a live case or controversy." *Swaby v. Ashcroft,* 357 F.3d 156, 161 (2d Cir.2004) (internal quotation marks and citation omitted). In *Swaby,* we held that a petitioner seeking a writ of habeas corpus vacating a removal order so as to render him eligible for discretionary relief from removal presented a live controversy because the writ, if granted, would remove a permanent bar on readmission and allow him to seek a purely discretionary form of relief from deportability. *Id.* at 161; *see also Kamagate v. Ashcroft,* 385 F.3d 144, 150 (2d Cir.2004) (same); *Perez v. Greiner,* 296 F.3d 123, 126 (2d Cir.2002) (noting in dicta that a challenge to a criminal conviction triggering a permanent bar on reentry "clearly would suffice to prevent [the] petition from being mooted"). Although these cases presented challenges involving *convictions* that stood as obstacles to eligibility for discretionary waivers, rather than a challenge to a *sentence,* the length of which informs the exercise of discretion as to such a waiver, in each case the "personal stake" of the alien is identical: an opportunity to re-enter the United States at the discretion of the Attorney General. *Swaby,* 357 F.3d at 161. That stake was sufficient to create a live controversy in our previous cases, and, for the same reason, we hold that Hamdi's appeal of his sentence is likewise not moot.

## II.

We now turn to the merits of Hamdi's unpreserved challenge to his sentence under *Booker.* This Court has previously considered the relationship between waiver provisions in plea agreements and the Supreme Court's decision in *Booker* in a trio of cases. In *United States v. Morgan,* 406 F.3d 135 (2d Cir.2005), we considered whether a waiver of appeal rights in the defendant's plea agreement, entered into before *Booker* was decided, barred him from challenging his sentence on the basis of that decision. Morgan had been sentenced to a term of imprisonment within the Guidelines range stipulated in his plea agreement, and the agreement included standard language waiving the right to appeal such a sentence.[8] Reasoning that the plea agreement process permitted the defendant and the government "to allocate risk, to obtain benefits, to achieve finality, and to save resources," and noting that "the possibility of a favorable change in the law after a plea is simply one of the risks that accompanies pleas and plea agreements," we found the appeal waiver enforceable against the defendant's *Booker* claim. *Id.* at 137–38. We subsequently held in *United States v. Haynes,* 412 F.3d 37 (2d Cir.2005), that the reasoning of *Morgan* applies in cases where the defendant preserved his Sixth Amendment objection to the Guidelines after entering into a plea agreement, noting that "[t]he fact that error was preserved at a sentencing subsequent to this receipt of benefits and allocation of risk [in the plea agreement] does not affect either the receipt or the allocation." *Id.* at 39. Finally, in *United States v. Roque,* 421 F.3d 118 (2d Cir.2005), we held that a defendant may not seek to withdraw a guilty plea, and the concomitant waiver of the right to appeal a

---

8. The substance of the plea agreement was discussed in an earlier opinion in the case.

*United States v. Morgan,* 386 F.3d 376, 377 (2d Cir.2004).

sentence, on the basis of the change in federal sentencing law wrought by *Booker*. *Id.* at 121. None of these precedents controls the disposition of this case.

Hamdi's plea agreement, which consists of seven numbered paragraphs, begins with the prefatory statement that the United States Attorney's Office for the Eastern District and Hamdi "agree to the following." The first paragraph states that Hamdi "will plead guilty" to a count charging him with a violation of 18 U.S.C. §§ 1028(a)(1) and 1028(c)(3)(A), whose penalty provisions are cited. Paragraph two recites that "[t]he defendant's sentence is governed by the United States Sentencing Guidelines" before stating the government's estimated Guidelines calculation. The third paragraph explains that the Guidelines estimate in the preceding paragraph is not binding on the Eastern District, the Probation Department, or the Court. Paragraph four is an explicit, detailed waiver provision, pursuant to which Hamdi agreed to waive his right to appeal his conviction or sentence "in the event that the Court imposes a term of imprisonment of 21 months or below." The fifth paragraph contains the Eastern District's obligations, providing, among other things, that "[t]he Office agrees" to bring no other charges against Hamdi relating to the charged conduct, to take no position on where within the Guidelines range Hamdi's sentence should fall, and to make no motion for an upward departure under the Guidelines. Finally, paragraph six informs Hamdi that the agreement binds only the Eastern District, not any other federal or state prosecuting authority, and paragraph seven states that the plea agreement reflects the entirety of the parties' agreement.

By the terms of Hamdi's plea agreement, he is released from his waiver of appeal rights in paragraph four because he was sentenced to more than twenty-one months' imprisonment. Hamdi argues that nothing else in the plea agreement bars or limits his right to challenge his sentence on direct appeal. Under our decision in *Crosby*, when a defendant brings an unpreserved claim of Sixth Amendment or procedural error under *Booker* and has not waived his right to do so, we will ordinarily remand to the district court "for the . . . limited purpose of permitting the sentencing judge to determine whether to resentence [to a nontrivially different term], . . . and if so, to resentence." *Crosby*, 397 F.3d at 117 (emphasis omitted). The government argues, however, that Hamdi has waived that right because the plea agreement, from which Hamdi does not seek to withdraw, contains prefatory language indicating that the Eastern District and Hamdi "agree to the following," and subsequently recites, in the second paragraph, that "[t]he defendant's sentence is governed by the United States Sentencing Guidelines." While a defendant's right to bring a Sixth Amendment or procedural error challenge under *Booker* can be waived, *see Morgan*, 406 F.3d at 137–38, we disagree with the government that the language it relies upon constitutes a waiver of Hamdi's appeal right.

"We review interpretations of plea agreements *de novo* and in accordance with principles of contract law." *United States v. Vaval*, 404 F.3d 144, 152–53 (2d Cir.2005) (internal quotation marks omitted). To determine whether Hamdi's attempt to appeal his sentence under *Booker* constitutes a breach of his agreement, we "look[ ] to the reasonable understanding of the parties as to the terms of the agreement." *United States v. Colon*, 220 F.3d 48, 51 (2d Cir.2000). Plea agreements, however, are "unique contracts, and we temper the application of ordinary contract principles with special due process

concerns for fairness and the adequacy of procedural safeguards." *United States v. Granik*, 386 F.3d 404, 413 (2d Cir.2004) (internal quotation marks and citation omitted). In particular, waivers of constitutional and statutory rights "are to be interpreted narrowly." *Id.* (internal quotation marks and citation omitted). In addition, "[b]ecause the government ordinarily has certain awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." *United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir.2004) (internal quotation marks and citation omitted).

█ We begin with the basic contract law principles that contracts are to be interpreted as a whole, *see* RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981); 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32:5 (4th ed.1999), and that contracts may, and frequently do, include recitals of the purposes and motives of the contracting parties, which may shed light on, but are distinct from, the contract's operative promises to perform. *See* 17A AM. JUR. 2D *Contracts* § 383 (2005); *see also Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir.2001) (noting the "well-established guideline[ ] in the law of contract construction" that "[a]lthough a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document" (internal quotation marks omitted; alteration in original)); *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1077 (2d Cir.1990) ("Although the 'Whereas' clauses of a contract do not determine its operative effect, they do furnish a background in relation to which the meaning and intent of the operative provisions can be determined.").

Hamdi's plea agreement does not include a separate section of recitals clearly designated as such. Instead, as noted above, it begins with the general prefatory statement that Hamdi and the Eastern District United States Attorney's Office "agree to the following." Several of the numbered paragraphs that follow include specific covenants and promises prefaced by such phrases as "[t]he defendant will," "the defendant agrees that," "the Office will," or "the Office agrees that." Notwithstanding the general prefatory statement that all that follows represents an agreement of the parties, promissory phrases introduce the key obligations created under the contract: the agreement states that Hamdi "will plead guilty" to the specified offense and "will not file an appeal" under specified conditions, while the government "agrees that" it will bring no further criminal charges and will not, absent certain specified conditions, move for an upward departure or take a position on where within the applicable Guidelines range Hamdi's sentence should fall.

The use of this language to preface obligations of the contracting parties suggests that we should not read the initial statement that the parties "agree to the following" to mean that *everything* that follows represents a promise by one party or the other. Otherwise it would be unnecessary to state, as the plea agreement repeatedly does, that "the defendant agrees" or "the Office agrees" to undertake particular covenants. *Cf.* 11 WILLISTON ON CONTRACTS § 32:5 (noting that contracts should not be interpreted to render a portion of the writing "superfluous[ ] ... or inexplicable."). More importantly, parts of the agreement that follow the general prefatory statement simply cannot be interpreted as covenants or promises to perform, because they are beyond the power of either party to promise. For instance, the third paragraph of the plea agreement recites that "[t]he Guidelines estimate set forth in

paragraph 2 is not binding on the ... Court." This statement reflects the well-settled legal principle that "the sentencing judge is of course not bound by the estimated range" in a plea agreement. *United States v. Rosa*, 123 F.3d 94, 98–99 (2d Cir.1997); *see also* Fed.R.Crim.P. 11(c). Because the parties are powerless to specify otherwise, this statement can only be understood as a recital of a fact germane to the parties' understanding of their agreement, but forming no operative part of that agreement. The plea agreement also recites, in paragraph seven, that it does not bind any "state ... or local prosecuting authority." It would be absurd to interpret this statement as a covenant of the parties to exempt those authorities from the plea agreement; it is clearly a recital of the basic fact that the benefits Hamdi secured in the agreement are only those within the legal power of the United States Attorney for the Eastern District of New York to confer. *See* 11 WILLISTON ON CONTRACTS § 32:11 ("[I]nterpretations which render the contract valid or its performance possible are preferred to those which render it invalid or its performance impossible.").

The language that the government suggests constitutes an operative waiver of appellate rights is similarly difficult to read as a promise by Hamdi. Unlike the explicit promissory sentences quoted above, it is purely declarative: "The defendant's sentence *is* governed by the United States Sentencing Guidelines" (emphasis added). The sentence introduces the plea agreement's second paragraph, the rest of which sets forth the government's estimate of the likely adjusted offense level based on the facts known to it at the time. Estimates of this kind are neither necessary elements of a plea agreement nor necessary predicates of a guilty plea itself. *See United States v. Fernandez*, 877 F.2d 1138, 1143 (2d Cir.1989). Like other United States Attorney's offices within this circuit, the Eastern District routinely includes such an estimate as part of a plea agreement or in a letter sent to the defendant in response to our observation in *United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991), that "appeals involving claims of unfair surprise would be significantly reduced if the Government would at least inform defendants, prior to accepting plea agreements, as to the likely range of sentences that their pleas will authorize under the Guidelines." *Id.* at 1034; *see also United States v. Palladino*, 347 F.3d 29, 33 (2d Cir.2003) (discussing a plea agreement between a defendant and the Eastern District containing a similar estimate); *United States v. Cuero Flores*, 276 F.3d 113, 115 & n. 1 (2d Cir.2002) (same, and noting that "[i]n this Circuit, the Government routinely informs defendants, in response to our invitation in *United States v. Pimentel*, as to the likely range of sentences that their pleas will authorize under the Guidelines" (citation omitted)); *United States v. McLeod*, 251 F.3d 78, 80–81 (2d Cir.2001) (noting that a defendant who pled guilty pursuant to a plea agreement in the Southern District received a "so-called *Pimentel* letter" containing the government's estimated Guidelines calculation).

The second paragraph of Hamdi's plea agreement contains no language that even arguably creates an obligation on Hamdi.[9]

---

9. The paragraph does include an explicit performative promise that "[t]he Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant," and notes that this information may be used by the sentencing court. This is the only sentence in the paragraph that contains promissory language. This language, however, does not create an obligation on the part of the Eastern District to Hamdi; it simply

Read as a whole, the paragraph has no evident purpose other than to comply with our suggestion in *Pimentel* that the government provide a defendant in Hamdi's position with an informed estimate of his sentencing exposure under the Guidelines.[10] While the sentence "The defendant's sentence is governed by the United States Sentencing Guidelines," standing apart from this paragraph, could be read as a covenant to which Hamdi agreed in light of the broad introductory language of the plea agreement, "[a] contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." 11 WILLISTON ON CONTRACTS § 32:11. In context, we do not find it natural to read this statement, which immediately precedes the government's Guidelines estimate, as anything other than an explanation of the significance of that estimate, provided as part of its routine attempt to "help[ ] to ensure that guilty pleas indeed represent intelligent choices by defendants." *Pimentel,* 932 F.2d at 1034. At most, the statement is ambiguous as to whether it constitutes a covenant binding on Hamdi.[11] Under our well-settled principles of construction of plea agreements, we resolve this ambiguity in Hamdi's favor and decline to read the

sentence as a waiver of appeal rights with respect to *Booker* procedural error. *See Granik,* 386 F.3d at 413; *Lenoci,* 377 F.3d at 258.

This conclusion, following close textual analysis of the plea agreement, is reinforced by the agreement's structure. Hamdi's obligations to plead guilty and to refrain from appealing under specified conditions are contained in the first and fourth paragraphs. The government's obligations to Hamdi are contained in the fifth paragraph. The remaining provisions, as discussed above, convey background factors that inform the parties' agreement but do not create obligations between them. Moreover, paragraph four is an explicit and detailed waiver provision giving no indication that the defendant has waived any rights not encompassed by its terms. In light of this structure, we are reluctant to construe what is at most an ambiguous sentence in a paragraph not otherwise allocating risks and benefits between the parties as a waiver of appeal rights.

It is important to note that our holding turns on an interpretation of the plea agreement in light of the parties' reasonable understanding at the time the agreement was made, *see Colon,* 220 F.3d at 51, and not on the extent to which Hamdi

---

informs Hamdi of a circumstance that will come to pass.

**10.** Notably, in *Palladino,* although the meaning of a statement that the Guidelines controlled was not at issue, the government took the position that a similar Guidelines estimate included in a plea agreement by the same office was "truly non-binding [on the parties] in all respects." 347 F.3d at 33.

**11.** We note that there is no explicit waiver of *Booker* rights here like the one in *United States v. Berheide,* 421 F.3d 538 (7th Cir. 2005). In *Berheide,* the Seventh Circuit held that a defendant who had entered into an addendum to his plea agreement after that

court's decision in *United States v. Booker,* 375 F.3d 508 (7th Cir.2004), specifically agreeing to the applicability of the Guidelines, had waived his right to any possible sentencing benefit that the Supreme Court's decision in *Booker* might have afforded him. 421 F.3d at 542. Similarly, the general waiver in this case is not as broad as that considered in *United States v. Blick,* 408 F.3d 162 (4th Cir. 2005), which provided that the defendant waived his right to appeal "any sentence within the maximum provided in the statute of conviction (or *the manner in which that sentence was determined)*" on "any ground whatsoever." *Id.* at 169 (internal quotation marks omitted; emphasis added).

could have anticipated subsequent changes in the law. The sentence in question carries a significance now that few would have attached to it before *Booker*, because prior to that decision it was a matter of clear statutory law that the Guidelines governed federal criminal sentences, including Hamdi's. *See* 18 U.S.C. § 3553(b)(1) (2000), *severed and excised*, *Booker*, 125 S.Ct. at 756; *see also Roque*, 421 F.3d at 120 ("Prior to [the decision in *Blakely*], neither statute nor precedent gave courts, counsel, or defendants reason to doubt that the United States Sentencing Guidelines were to be applied mandatorily in federal courts."). As we recently observed in the context of a defendant's attempt to bring a preserved *Booker* claim notwithstanding an appeal waiver, "ignorance of future rights is unavoidable and not a basis for avoiding a plea agreement." *Haynes*, 412 F.3d at 39 (citing *Morgan*, 406 F.3d at 137 n. 2). If Hamdi's plea agreement contained an explicit agreement on his part not to challenge the applicability of the Guidelines and Hamdi sought to escape that obligation by arguing that it was entered into in ignorance of his future right to be sentenced under non-mandatory Guidelines, his appeal would be foreclosed by our recent holding in *Roque*, 421 F.3d at 123–24, which rejected such a claim where the defendant was subject to a general waiver of appeal rights. But that is not this case. Hamdi seeks only resentencing under a regime in which the Guidelines are merely advisory, arguing that he is not bound by the sole waiver of appeal rights in his plea agreement. *Cf. United States v. Maher*, 108 F.3d 1513, 1520–24, 1531 (2d Cir.1997) (noting the distinction between a challenge to a sentence and a challenge to the voluntariness of the underlying plea).

This case simply does not implicate the rule that an explicit waiver of appeal rights includes even those rights not yet recognized at the time the parties entered into the plea agreement. Nonetheless, the government would have us conclude that a declaratory provision in a plea agreement bearing none of the indicia of an explicit waiver, or even of an obligation between the parties, implicitly waives rights later recognized. Prudence and fairness caution against accepting the government's argument. A general waiver of appeal rights is necessarily elastic, encapsulating even subsequently recognized rights that the defendant was not prophetic enough to foresee. But an arguably ambiguous plea provision not denominated as a waiver, and which would not have been understood as a waiver by the parties at the time they entered into the agreement, may not be so transformed *ex post* merely because the language logically relates to the newly recognized right and could plausibly be interpreted, in isolation and in light of current understanding, as a waiver of that right. To conclude otherwise would be to attribute anachronistically an intent to the parties that, on the face of the agreement, was not within their contemplation. Moreover, such a conclusion would have serious consequences, stopping *Booker* "procedural error" appeals in their tracks for defendants who pled guilty in districts using similar stock language in their plea agreements. In that regard, if we were to accept the government's argument, the effect of our ruling on defendants would depend in large part upon the fortuity of whether a particular United States Attorney's office includes *Pimentel* language in plea agreements as a matter of course or instead sends each defendant a *Pimentel* letter before entering into a plea agreement that, as a result, includes no estimated Guidelines calculation or language about the applicability of the Guidelines. We do not sanction here that kind of arbitrary disparity on the basis of a provision

in a plea agreement that we determine was not an agreement on Hamdi's part to be sentenced under mandatory Guidelines.

Hamdi was released from his general, explicit appeal waiver as a result of the twenty-four-month sentence imposed by the district court. Because we agree with Hamdi that the recitation of the Guidelines' applicability was not a promise on Hamdi's part that he would not challenge his sentence for procedural error, there is no bar to his unpreserved *Booker* claim on this appeal.[12] We therefore dispose of this claim in the usual manner, by remanding the case to the district court pursuant to *Crosby* for a determination of whether or not to resentence.

## CONCLUSION

For the foregoing reasons, we hold that Hamdi's appeal is not moot and REMAND the case for further proceedings consistent with *Crosby*, 397 F.3d at 119–20.

---

**12.** Several of our sister circuits have concluded that a defendant is barred from asserting a claim of *Booker* error by a general appeal waiver from which he or she has not been released *and* an agreement to be sentenced under the Guidelines. *See, e.g., United States v. Green,* 405 F.3d 1180, 1189 (10th Cir.2005) (holding that where the defendant "indicated an acceptance of the mandatory Guidelines regime that existed before *Booker*," any challenge to the mandatory nature of the regime fell within the scope of the general appeal waiver); *United States v. Bradley,* 400 F.3d 459, 461, 464–65 (6th Cir.2005) (holding that general appeal waiver and specific agreement to be sentenced under Guidelines together barred challenge to their mandatory application). These cases are not materially distinguishable from our holdings in *Morgan, Haynes,* and *Roque* because the operative plea agreement provision in each case was a general waiver of appeal rights interpreted to include *Booker* rights. We are aware of no case holding that general language in a plea agreement that the Guidelines govern a defendant's sentence, in the absence of an applicable general waiver, constitutes a waiver of *Booker* rights. Thus, for the reasons explained above, these cases are not analogous to the instant one—Hamdi is not subject to a general appeal waiver and did not agree to be sentenced under the Guidelines. We further note that the Sixth Circuit subsequently clarified the reach of its holding in *Bradley*, concluding that a defendant who is not bound by a general appeal waiver but who agreed to be sentenced under the Guidelines is not barred from raising a plain-error *Booker* claim on appeal. *United States v. Amiker,* 414 F.3d 606, 607–08 (6th Cir.2005). While our reasoning does not track that in *Amiker,* we reach the same result.