*1211 HOLMES, Circuit Judge,
concurring in part and dissenting in part.
I write separately to take issue with the majority’s analysis of the breach-of-contract claim of the California residential consumers. See Maj. Op. at 1203-08. Specifically, I believe that a straightforward interpretation of the AT & T Consumer Service Agreement (“CSA”) and AT & T Service Guide (“CSG”) ineluctably dictates the conclusion that the California residential consumers agreed to pay the specific Universal Connectivity Charge (“UCC”) listed in the Rates and Charges section of the CSG. Although the majority concludes that AT & T hamstrung the applicability of this specific UCC with a generalized statement of purpose in a preliminary section of the CSG, I find that the CSA and CSG are not properly susceptible to that interpretation.
Based on my interpretation of the CSA and CSG, I would remand this matter to the district court and direct it to enter judgment in favor of AT & T as a matter of law on the California residential consumers’ breach-of-contract claim. I thus would not reach the district court’s disposition of the motion for a new trial, or the motion for remittitur. I concur with the majority’s conclusions regarding preemption and the breach-of-contract claim of the business consumers.
I. Judgment as a Matter of Law
We should reverse the denial of AT & T’s motion for judgment as a matter of law on the breach-of-contract claim of the California residential consumers because (1) a plain-meaning interpretation of the CSA and CSG shows that the California residential consumers agreed to pay the specific UCC listed in the Rates and Charges section of the CSG; (2) the Description section contains no separate and independent promise regarding the amount of the UCC; and (3) even if the Description section were to contain such a promise, the majority’s decision still would miss the mark because it conflicts with basic principles of contractual interpretation.
A. Standard of Review
‘We review de novo the denial of a motion for judgment as a matter of law.” Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d 1260, 1269 (10th Cir.2008). In conducting this review, we will reverse the district court “only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.” M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 761 (10th Cir.2009) (internal quotation marks omitted). “A party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the non-moving party, reveals no legally sufficient evidentiary basis to find for the non-moving party.” Burrell v. Armijo, 603 F.3d 825, 832 (10th Cir.2010). Contract interpretation is a question of law, which we also review de novo. See Level 3 Commc’ns, LLC v. Liebert Corp., 535 F.3d 1146, 1154 (10th Cir.2008). New York law governs the interpretation of the CSA and CSG. ApltApp. at 1653 (“This Agreement will be governed by the law of the State of New York, without regard to its choice of law rules.... ”).
B. Plain Meaning
Under New York law, we must interpret a contract in accordance with the intent of the parties. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166,170 (2002). “[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.” IDT Corp. v. Tyco Grp., S.A.R.L., 13 N.Y.3d 209, 890 N.Y.S.2d 401, 918 N.E.2d 913, 916 (2009) (internal quotation marks omitted). “An agreement is unam *1212 biguous when its words have a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.” Vintage, LLC v. Laws Constr. Corp., 13 N.Y.3d 847, 892 N.Y.S.2d 286, 920 N.E.2d 342, 343 (2009) (internal quotation marks omitted) (brackets omitted).
In this action, the plain meaning of the CSA provides that the California residential consumers agreed to pay the specific UCC charge listed in the Rates and Charges section of the CSG. This plain meaning is evident from (1) the preamble to the CSA; (2) the general section on charges and payment; and (3) the section on taxes and other charges.
1.Preamble
In the preamble to the CSA, the California residential consumers “agree[d] to the prices, charges, terms and conditions in this agreement.” ApltApp. at 1649 (capitalization omitted). Because the CSA “incorporates by reference the priees[ ] [and] charges ... in the [CSGs],”[1] id. (capitalization omitted), it includes the specific rates and charges listed in the CSG governing the UCC. This CSG, in turn, provides that the UCC is equal to a specific percentage of a consumer’s total interstate and international charges.[2] See, e.g., id. at 1666 (“The Universal Connectivity Charge is equal to 9.9% of your total billed state-to-state and international charges (excluding taxes).”).
2.General Charges and Payment
Under section 1(a) of the CSA, the California residential consumers “agree[d] to pay [AT & T] for the Services at the prices and charges listed in the AT & T Service Guides.” Id. at 1649. Even though the UCC does not appear to meet the definition of a “Service” under the CSA,[3] it does qualify as a “price and charge” for a “Service” that the California residential consumers received. Therefore, section 1(a) still required the California residential consumers to pay the specified UCC. Section 1(a) specifically notes that “[t]he prices and charges for the Services may also include, for example, monthly fees, monthly mínimums, or connection charges.” Id. Although section 1(a) does not list the UCC as an example of these “prices and charges,” the common denominator of the listed examples is that they all consist of fees and charges associated with the provision of interstate and international telecommunications services. The UCC fits within this set of examples because it is a monthly charge that is calculated using the total billed amount of a consumer’s interstate and international traffic. Thus, the California residential consumers were required to pay the UCC in the amount specified in the CSG (which the CSA incorporated).
3.Taxes and Other Charges
Under section 1(e) of the CSA, California residential consumers “must pay all *1213 taxes, fees, surcharges and other charges that [AT & T] bill[s] [them] for the Services.” Id. at 1650. As discussed supra, the UCC is a fee or charge that AT & T imposes on consumers in connection with their use of interstate and international telecommunications services. Neither party disputes that “AT & T at all times charged its residential customers precisely the percentage listed in the [CSG].” Id. at 822.
Although section 1(e) also provides that “[t]axes and surcharges will be in the amounts that federal, state and local authorities require us to bill you,” id. at 1650, this provision does not support the majority’s contention that AT & T may not charge consumers more than the amount it is required to contribute to the Universal Service Fund (“USF”). First, this sentence does not apply to the UCC because, as the district court recognized, the UCC is not a tax or a surcharge.[4] See id. at 995 (holding, as a matter of law, that the CSA is “unambiguous that the UCC is not a ‘surcharge’ that is subject to the limitation set forth in ... § 1(e)”); see also Federal-State Joint Bd. on Universal Serv., CC Docket No. 96-45, Report and Order, 12 FCC Red. 8776, 9211-12 ¶855 (1997) [hereinafter Report and Order ] (stating that the FCC “believefs] that it would be misleading for a carrier to characterize its [universal service] contribution as a surcharge” because “carriers retain the flexibility to structure their recovery of the costs of universal service in many ways”); cf. Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 427 (5th Cir.1999) (finding, in dicta, that universal service contributions are not a tax) (citing Rural Tel. Coal. v. FCC, 838 F.2d 1307, 1314 (D.C.Cir.1988)).
Second, even if the UCC were a tax or a surcharge, it would not be subject to this provision because the federal authorities do not require AT & T to bill consumers for the UCC. See Report and Order, 12 FCC Red. at 9199 ¶ 829 (“[C]arriers will be permitted, but not required, to pass through their contributions to their interstate access and interexchange customers.”); see also Boomer v. AT & T Corp., 309 F.3d 404, 411 n. 1 (7th Cir.2002) (“[C]arriers may charge consumers to recover the cost of [universal service] contributions.” (emphasis added)).
Thus, under the plain language of the CSA and CSG, AT & T has not breached its contract because it charged the California residential consumers the specific UCC listed in the Rates and Charges section of the CSG.[5] See ApltApp. at 772 (“It is *1214 undisputed that AT & T charged its residential customers precisely the percentage listed in the [CSG].”); id. at 822 (same).
C. Description Section
The majority’s interpretive analysis is misguided: it effectively circumvents the plain meaning of the CSA and CSG. In particular, when interpreting the CSG, the majority places an unnatural emphasis on a general statement of purpose in the introductory Description section instead of simply applying the specific UCC listed in the Rates and Charges section.
The Description section provides as follows:
The AT & T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT & T must pay into a federal program called the Universal Service Fund (USF). The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas. It also provides discounts on Internet access for eligible schools, libraries and rural health care providers. AT & T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes.
Id. at 1665 (emphasis added). The majority follows the district court in interpreting the first sentence of this Description section as a promise by AT & T to recover no more than the amount of its USF contribution from its residential consumers. See Maj. Op. at 1206; see also ApltApp. at 1607 (interpreting this sentence “unambiguously [to] provide[] that AT & T could ‘recover amounts that AT & T must pay’ into the USF program, and no more”).
1. Incorporation by Reference
As an initial matter, the CSA incorporates by reference the Description section of the CSG. In pertinent part, the CSA provides that
“AT & T Service Guides” contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services.... THIS AGREEMENT INCORPORATES BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS INCLUDED IN THE AT & T SERVICE GUIDES.
Aplt-App. at 1649.
Although AT & T insists that the CSA does not incorporate the Description section, I agree with the majority that this argument is unpersuasive. There are several reasons. First, the incorporation clause specifically includes “terms and conditions” of the CSG. Id. Even though AT & T correctly notes that the CSG has a specific subsection entitled “Terms and Conditions,” the CSA broadly construes the phrase “terms and conditions.” The CSA notes that the CSG “eontain[s] the specific prices and charges, service descriptions and other terms and conditions.” Id. (emphasis added). This provision im *1215 plicitly suggests that the phrase “terms and conditions” encompasses more than the expressly designated “terms and conditions” and extends to include descriptive language as well. Second, the merger clause provides that the CSA “incorporates by reference the AT & T Service Guides,” without carving out any particular portions of the CSG. Id. at 1653. Third, the CSA incorporates by reference the Description section because the CSG must be interpreted as a whole, including the descriptions of any terms, under basic principles of contractual interpretation. See IDT Corp., 890 N.Y.S.2d 401, 918 N.E.2d at 916; see also Restatement (Second) of Contracts § 202(2) (1981); 11 Samuel Wil-liston & Richard A. Lord, A Treatise on the Law of Contracts § 32:5 (4th ed. 1999 & Supp. 2010); 5 Margaret N. Kniffin, Corbin on Contracts § 24.21 (Rev. ed. 1998). Fourth, the CSG itself provides that “AT & T Service Guides are ... part of the AT & T Consumer Services Agreement.” ApltApp. at 1665, 1666. Finally, AT & T conceded that the CSA incorporated the CSG by reference at oral argument and before the district court.
2. Prefatory Language
Even though the CSA incorporated the CSG’s Description section by reference, the majority’s interpretation is untenable because the first sentence of the Description section is unenforceable prefatory language. Under New York law, prefatory language to a contract is not part of the operative agreement. See, e.g., Burr v. Am. Spiral Spring Butt Co., 81 N.Y. 175, 178 (1880) (“Recitals in a contract are not strictly any part of the contract....”); Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp., 16 A.D.3d 279, 791 N.Y.S.2d 409, 410 (N.Y.App.Div.2005) (“[Rjecitals ... are not part of the operative agreement.”); Ross v. Ross, 233 A.D. 626, 253 N.Y.S. 871, 882 (N.Y.App.Div.1931) (“The recitals in a contract form no part thereof .... ”), aff'd sub nom., Hutchison v. Ross, 262 N.Y. 381, 187 N.E. 65 (1933). Courts have treated clauses that are analogous to the Description language at issue here as the functional equivalents of recitals. See, e.g., United States v. Hamdi, 432 F.3d 115, 123 (2d Cir.2005) (Sotomayor, J.) (finding that the introductory section of a plea agreement was a “general prefatory statement,” even though it used a promissory phrase); Olander v. State Farm Mut. Auto. Ins. Co., 317 F.3d 807, 811 (8th Cir.2003) (finding that hortatory language in the preamble to an agreement was effectively a recital); Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir. 2001) (finding that a “Purpose of the Plan” provision of a contract “is analogous ... to a contract’s ‘whereas’ clause”); Devan Motors of Fairfield, Inc. v. Infiniti Div. of Nissan N. Am., Inc., 579 F.Supp.2d 294, 313 (D.Conn.2008) (“The description of a contract’s purposes is analogous to a ‘whereas’ clause.”); Sengillo v. Valeo Elec. Sys., Inc., 536 F.Supp.2d 310, 312 (W.D.N.Y.2008) (noting that, under New York law, a clause “which is functionally a recital does not, ‘by any other name,’ or even in the absence of a clarifying heading, comprise an enforceable contractual term”), aff'd, 328 Fed.Appx. 39 (2d Cir. 2009).
The enforceability of prefatory language depends on whether it serves an operative purpose. In general, prefatory language merely provides context to explain the purpose of the agreement. See, e.g., Ross, 253 N.Y.S. at 882 (stating that recitals “at most indicate ... the purposes and motives of the parties”); see also Black’s Law Dictionary 1385 (9th ed. 2009) (defining the term “recital,” or “whereas clause,” to mean “[a] preliminary statement in a contract ... explaining the reasons for entering into it or the background of the transaction, or showing the existence of particular facts”). “Although a *1216 statement in a ‘whereas’ clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document.” Grand Manor Health Related Facility, Inc. v. Hamilton Equities, Inc., 65 A.D.3d 445, 885 N.Y.S.2d 255, 256 (N.Y.App.Div.2009); see Trump Vill. Section 3, Inc. v. N.Y. State Hous. Fin. Agency, 292 A.D.2d 156, 739 N.Y.S.2d 37, 38 (N.Y.App.Div.2002) (holding that the recital clause did not “impose contractual obligations ... beyond those specifically set forth in the contract”); Musman v. Modern Deb, Inc., 56 A.D.2d 752, 392 N.Y.S.2d 24, 26 (N.Y.App.Div.1977) (“Where a recital clause and an operative clause are inconsistent, the operative clause if unambiguous, should prevail.”).
In this action, the first sentence of the Description section is prefatory language to the specific terms of the CSG. The majority insists that this sentence is an operative contract term. See Maj. Op. at 1205-06. However, this sentence merely defines the UCC as “a monthly charge to Customers to recover amounts AT & T must pay into a federal program called the Universal Service Fund (USF).” Aplt. App. at 1665. This sentence explains that the purpose of the UCC is to enable AT & T to recover its USF contributions through the specific amounts collected under the Rates and Charges section of the CSG. It has no operative contractual effect.
3. No Promise
The first sentence of the Description section also contains no evidence of a promise. Under New York law, “[a] promise is ‘a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.’ ” Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106, 472 N.Y.S.2d 592, 460 N.E.2d 1077, 1081 (1984) (quoting Restatement (Second) of Contracts § 2(1) (1981)).
In this action, the first sentence of the Description section is not a promise for at least three reasons.[6] First, this sentence does not express a manifestation of AT & T’s intent to act in a specified way. The first sentence provides that the UCC “is a monthly charge to Customers to recover *1217 amounts AT & T must pay into a federal program called the Universal Service Fund (USF).” ApltApp. at 1665. As discussed supra, Part I.C.2, this sentence is merely a declarative statement explaining the nature and purpose of the UCC. See Hamdi, 432 F.3d at 124. This sentence also contains no indication that AT & T would limit its recovery to the USF contributions attributable to residential consumers, would recover USF contributions only for a particular time period, would not overcollect its USF contribution in any given period of time, or would refund any overeollections. In short, this sentence lacks the specificity to constitute a promise.
Second, this sentence lacks any promissory language directed to the California residential consumers. See Merritt Hill Vineyards, 472 N.Y.S.2d 592, 460 N.E.2d at 1081 (stating that contractual language was not a promise because “[n]o words of promise [we]re employed”); see also Ham-di, 432 F.3d at 123 (finding that the preliminary language in a plea agreement was not a promise, even though it used the word “agree,” because the following numbered paragraphs contained “specific covenants and promises prefaced by ... promissory phrases”). In particular, the first sentence of the Description section contains no words, such as “agree,” “will,” or “shall,” which are evident in other promises in the CSA and CSG.[7] See, e.g., Aplt. App. at 1649 (“You agree to pay us for the Services at the prices and charges listed in the AT & T Service Guides.”). Although the specific UCC in the Rates and Charges section likewise lacks any promissory language, the CSA uses promissory language that encompasses the specific UCC. See id. at 1650 (‘You must pay all ... charges that we bill you for the Services.... ”). In the absence of such promissory language, the first sentence of the Description section is not a promise.
Third, the context of the Description section confirms that the first sentence is not a promise. For example, the second and third sentences further describe the nature and purpose of the USF. Id. at 1665 (“The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas. It also provides discounts on Internet access for eligible schools, libraries and rural health care providers.”). This background information identifies the programs and beneficiaries of universal service support. The California residential consumers even concede that these two sentences are not independent promises.
Although the majority believes that the final sentence undermines the argument that the first sentence is not a promise, Maj. Op. at 1205 n. 6, the final sentence actually supports the notion that the first sentence is prefatory language. In the final sentence, AT & T provides that it “will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes.” ApltApp. at 1665. Assuming, arguendo, that this sentence constitutes a promise because of its use of the word “will,” it only highlights the absence of such promissory language in the first sentence.
Based on this interpretation, the first sentence of the Description section is not an enforceable provision of the contract because it creates no rights beyond the operative terms of the CSA and CSG. Thus, because the California residential consumers may not base their breach-of-contract claim on prefatory language, this claim fails as a matter of law.
*1218 D. Basic Principles of Contractual Interpretation
Even assuming, arguendo, that the first sentence of the Description section constitutes a promise to recover the amount AT & T must pay to the USF, the majority’s interpretation of the CSA and CSG is still flawed. In particular, the majority’s decision conflicts with basic principles of contractual interpretation because it (1) fails to give specific terms greater weight than general language, (2) adds terms to the description of the UCC, and (3) reaches a conclusion that is absurd, commercially unreasonable, and contrary to reasonable expectations.[8]
1. Specific Contractual Terms
Under New York law, a basic principle of contractual interpretation is that specific terms override general language. See, e.g., Bowmer v. Bowmer, 50 N.Y.2d 288, 428 N.Y.S.2d 902, 406 N.E.2d 760, 762 (1980); accord John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 669 n. 8 (2d Cir.1983) (“New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.”); see also Restatement (Second) of Contracts § 203 (1981) (“In the interpretation of a promise or agreement or a term thereof, ... specific terms and exact terms are given greater weight than general language.”). If the general and specific provisions are inconsistent, “the specific provision controls.” Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688, 690 (1956); accord Aguirre v. City of New York, 214 A.D.2d 692, 625 N.Y.S.2d 597, 598 (N.Y.App.Div.1995); see also 11 Williston & Lord, supra, § 32:10 (“Where general and specific clauses conflict, the specific clause governs the meaning of the contract.”); 5 Rniffin, supra, § 24.23 (“If the apparent inconsistency is between a clause that is general and broadly inclusive in nature and one that is more limited and specific in its coverage, the more specific term should usually be held to prevail over the more general term.”); cf. Israel v. Chabra, 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374, 380 n. 3 (2009) (noting that “ ‘the more specific clause controls the more general,’ ” if the contractual provisions are irreconcilable) (quoting 11 Williston & Lord, supra, § 32:15).
In this action, the specific terms of the Rates and Charges section override the general language of the Description section. The Rates and Charges section prescribes that the UCC is a specific percentage of the consumer’s interstate and international bill. See, e.g., ApltApp. at 1666. By contrast, to the extent the Description section is a promise, it uses general language to limit the UCC to the amount that AT & T must pay into the USF. Id. at 1665. Although the sections address the same subject matter, viz., the amount of the UCC rate, they are inconsistent because they provide different methodologies to calculate the UCC. Thus, the specific terms of the Rates and Charges section trump the broad language of the Description section.
*1219 The majority claims that it has not violated this principle because its interpretation reconciles these two sections. Maj. Op. at 1206-07. Under New York law, we must interpret a contract “so as to give full meaning and effect to the material provisions.” Excess Ins. Co. v. Factory Mut. Ins. Co., 3 N.Y.3d 577, 789 N.Y.S.2d 461, 822 N.E.2d 768, 771 (2004); accord Beal Savings Bank v. Sommer, 8 N.Y.3d 318, 834 N.Y.S.2d 44, 865 N.E.2d 1210, 1213 (2007) (“A reading of the contract should not render any portion meaningless.”); see also Restatement (Second) of Contracts § 203(a) (“[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.”). The majority interprets the Description section to require AT & T to “limit its UCC collections to amounts it was required to pay into the USF” and to “provide[ ] a mechanism for changing this rate.” Maj. Op. at 1207. On the other hand, the majority interprets the Rates and Charges section simply to “de-fíne[ ] the mechanism for collecting funds.” Id. at 1207. Thus, the majority concludes that these two sections are not irreconcilable because they impose separate obligations.
The majority errs because, in “giv[ing] full meaning and effect” to all of the provisions, it fails to give the specific term greater weight than the general language. Under New York law, if the specific and general provisions of a contract are reconcilable, ‘‘the specific provisions tend to restrict the general.” Bowmer, 428 N.Y.S.2d 902, 406 N.E.2d at 762; accord Muzak Corp., 150 N.Y.S.2d 171, 133 N.E.2d at 690 (holding that the specific provision trumped the general provision, even in the absence of any inconsistency between those provisions); accord Aramony, 254 F.3d at 413-14; see OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp., 503 F.Supp.2d 490, 515 (D.Conn.2007) (applying New York law); see also 11 Williston & Lord, supra, § 32:10 (“Even absent a true conflict, specific words will limit the meaning of general words if it appears from the whole agreement that the parties’ purpose was directed solely toward the matter to which the specific words or clause relate.”). In direct contrast to this basic principle, the majority seeks to harmonize these provisions by giving greater weight to the general language and finding that AT & T would be in breach of the CSA, even though it charged the specific UCC listed in the CSG.[9]
2. Added Terms
Under New York law, “courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.” Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13 N.Y.3d 398, 892 N.Y.S.2d 303, 307, 920 N.E.2d 359 *1220 (2009) (internal quotation marks omitted). “[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.” Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 775 N.Y.S.2d 765, 807 N.E.2d 876, 879 (2004) (internal quotation marks omitted).
In this action, the district court improperly added material terms to the description of the UCC that altered the agreement of the parties. First, the district court concluded “as a matter of law that the contract unambiguously provides that AT & T could recover amounts AT & T must pay into the USF program, and no more.” ApltApp. at 1607 (emphasis added) (internal quotation marks omitted). The district court indisputably added the phrase “and no more” when interpreting the CSA and the CSG. Although the majority claims that this phrase “merely emphasized the operative promise” to “collect via the UCC charge those amounts ‘it must pay’ into the USF,” Maj. Op. at 1206, this addition artificially eliminated AT & T’s flexibility under § 201(b) to collect a reasonable amount — an amount that could be more or less than its USF contribution in any given time period. A concession of this magnitude would certainly have produced more fanfare than is evident from the first sentence of the Description section.
Second, the district court implied that AT & T had promised to balance the UCC amounts it recovered with the amounts it was required to pay “over a reasonable period of time.” ApltApp. at 1614. The district court claimed that it could imply a reasonable time of performance because “not all terms of a contract need be fixed with absolute certainty.” Id. at 1613 (quoting Express Indus. & Terminal Corp. v. New York State Dep’t of Transp., 93 N.Y.2d 584, 693 N.Y.S.2d 857, 715 N.E.2d 1050, 1053 (1999)). The district court interpreted this “reasonable period of time” to consist of “a period of many billing cycles.”[10] Id. at 1614.
Under New York law, in certain situations, courts may supply a reasonable term to a contract. “What constitutes a reasonable time ... depends upon the facts and circumstances of the particular case.” Savasta v. 470 Newport Assocs., 82 N.Y.2d 763, 603 N.Y.S.2d 821, 623 N.E.2d 1171, 1172 (1993). Courts typically supply a reasonable time period if the contractual performance was inordinately delayed or the purpose of the contract suggests a reasonable time frame. See, e.g., id. at 1172-73 (holding that a twenty-two month delay in providing notice of the termination of the partnership was unreasonable); Haines v. City of New York, 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820, 822-23 (1977) (viewing the surrounding circumstances, in a case involving the maintenance of a sewage disposal facility, and inferring that a reasonable period of time was the length of time that the city needed or desired the water treated at that facility). It is patent that neither circumstance is present here: there is no issue of inordi *1221 nate delay and the overarching telephone-service purpose of the contracts tells us nothing about the possible nature of any reasonable period for effecting a “true-up” of UCC charges — why “many billing cycles,” as opposed to a day, week, month, quarter, year, or the duration of an individual consumer’s contract? And, on this record, I can discern no reason why it would be appropriate to move beyond these typical scenarios where the courts have employed reasonable-time-period inferences. Therefore even assuming, ar-guendo, that AT & T had promised to balance the UCC amounts it recovered with its USF contributions, the district court erred by reading into the contracts a reasonable time period by which AT & T was obliged to effectuate that balancing.
3. Absurd Results
“A contract should not be interpreted to produce a result that is absurd, commercially unreasonable!;,] or contrary to the reasonable expectations of the parties.” Lipper Holdings, LLC v. Trident Holdings, LLC, 1 A.D.3d 170, 766 N.Y.S.2d 561, 562 (N.Y.App.Div.2003) (citations omitted); accord Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V., 40 A.D.3d 415, 836 N.Y.S.2d 160, 164 (N.Y.App.Div.2007) (“[A] ‘strange, unnatural and unreasonable reading of the contract’ should be avoided.”) (citation omitted) (quoting Fleischman v. Furgueson, 223 N.Y. 235, 119 N.E. 400, 402 (1918)).
In this action, the majority interpreted the first sentence of the Description section as a promise to “ ‘recover amounts AT & T must pay’ into the USF program, and no more.” See, e.g., Maj. Op. at 1206. This interpretation would lead to absurd results because AT & T could not reasonably set a UCC that would recover the exact amount of its USF contribution, given the fluctuations inherent in the calculation of its contribution based on historical revenues. See Report and Order II, 17 FCC Red. at 24969 ¶ 30 (noting that, during the relevant time period, “contributions [we]re assessed on revenues from six months prior”); see also Aplt. Br. at 13 (stating that in light of the operative contribution methodology AT & T “would need to charge its customers a USF percentage rate that (on average) was significantly higher than the contribution factor in order to recover the amount of the tax [i.e., the USF contribution]” (emphasis omitted) (citing ApltApp. at 757)).
Although the district court suggested that AT & T could refund excess UCC collections or undercollect the UCC from its consumers, neither of these alternatives was reasonably contemplated by the parties in the CSA or the CSG. To the contrary, other provisions of the CSA and CSG specifically grant consumers a credit allowance for interrupted service, indicating that AT & T knew how to provide refunds for overcharged services and did not intend to do so here. See ApltApp. at 866, 1652. The absence of a “true-up” mechanism or similar provision in the CSG likewise suggests that AT & T assumed no obligation to refund any alleged overpay-ments of the UCC. Furthermore, the district court’s proposal that AT & T habitually undercollect the UCC is unreasonable. As discussed supra note 5, AT & T was under no regulatory obligation to recover the exact amount of its USF contributions, “and no more,” because the FCC merely prohibits telecommunications providers from assessing “unreasonable and unjust” charges and from “shift[ing] more than an equitable share of USF contributions to any customer or group of customers.” Thus, the majority’s interpretation would not yield a commercially reasonable result or a result that complies with the reasonable expectations of the parties.
II. Conclusion
For the aforementioned reasons, I respectfully concur in part and dissent in *1222 part. I concur as to the majority’s conclusions regarding preemption and the business consumers’ breach-of-contract claim. I am constrained to dissent, however, as to the majority’s conclusions regarding the California residential consumers’ breach-of-contract claim. Based on my interpretation of the CSA and the CSG, I find no evidence or reasonable inference showing that AT & T breached the contract by imposing the UCC on the California residential consumers. Based on these conclusions, I would remand this matter to the district court and direct it to enter judgment in favor of AT & T as a matter of law on the California residential consumers’ breach-of-contract claim.

. Neither party disputes that the CSA incorporates by reference the UCC rates and charges listed in the CSG. The parties do disagree on whether the CSA incorporates by reference the Description section of the CSG; this issue is addressed infra Part I.C.l.

. This specific percentage fluctuated over the course of the relevant time period. See, e.g., Aplt.App. at 856 (9.9% on August 1, 2001); id. at 892 (11.5% on January 1, 2002); id. at 895 (11% on July 1, 2002).

.The CSA defines the term “Service” to mean "state-to-state and international consumer telecommunications services” and identifies some of these service types as “direct-dialed from home, operator-assisted, [and] calling card calls.” Aplt.App. at 1649. By contrast, the UCC is a price (i.e., fee) or charge associated with interstate and international telecommunications services and, therefore, is unlike the other "Services” under the CSA.

. AT & T comes perilously close to conceding that the UCC is a tax. Throughout its briefs, AT & T refers to the universal service payment as a "tax” that it passes through to its consumers. Although AT & T repeatedly uses the word "tax,” it initially places that word in quotation marks. Aplt. Opening Br. at 5 (stating that the UCC is a charge that it "imposed on its residential customers so that they ... would pay an equitable share of a ‘tax' that the Federal Communications Commission ('FCC') had required all long distance telephone companies to pay in order to support 'universal [telephone] service' ” (brackets in original)). This appears to indicate that AT & T employed this misnomer in an attempt to describe the complexities of USF contribution in common parlance.

. The California residential consumers have not alleged that AT & T charged them anything other than the UCC listed in the CSG. Plaintiffs instead complain that this interpretation of the CSA "would ... hold that AT & T's customers agreed to a contract under which AT & T could charge any amount it chose for any purpose while still describing the assessment as a UCC charge.” Aplee. Opening Br. at 50-51; accord id. at 58. This argument reflects a fundamental misunderstanding of the laws and regulations governing the USF mechanism. At all times relevant to this action, nothing in the statute or *1214 regulations prohibited AX & T from marking up the USF line item above the relevant contribution amount. See Federal-State Joint Bd. on Universal Serv., Report and Order and Second Further Notice of Proposed Rulemak-ing, 17 FCC Red. 24952, 24978 V¶ 49, 51 (2002) [hereinafter Report and Order II ] (noting that "carriers may not mark up federal universal service line-item charges above the relevant contribution factor” once the new universal service contribution methodology takes effect on April 1, 2003, which was after the times relevant here). Of course, AT & T did not have free reign to charge any amount because the UCC must be "just and reasonable.” 47 U.S.C. § 201(b) (providing that "[a]ll charges ... for and in connection with such communication service!] shall be just and reasonable”). AT & T also "may not shift more than an equitable share of [its] contributions to any customer or group of customers.” Repon and Order, 12 FCC Red. at 9199 ¶ 829.

. AT & T also argues that the Description section is not a promise because "the description was ... required by the FCC's regulations.” Aplt. Opening Br. at 33 (arguing that the FCC’s regulations "mandate that all telephone charges ... 'be accompanied’ by a 'plain language description of the service or services rendered’ ”); accord id. at 34, 39; Aplt. Reply Br. at 9. This argument is not entirely accurate. At all times relevant to this class action, the FCC required "[c]harges contained on telephone bills [to] be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered.” 47 C.F.R. § 64.2401(b) (emphasis added); see Report and Order, 12 FCC Red. at 9212 ¶ 855 ("[I]f [universal service] contributors ... choose to pass through part of their contributions and to specify that fact on customers’ bills, contributors must be careful to convey information in a manner ... that accurately describes the nature of the charge.” (emphasis added)). But the truth-in-billing requirement applies only to customer bills and not to service agreements.
Even though the truth-in-billing requirement does not apply to service agreements, this argument supports my interpretation of the CSA and CSG. Courts have found that declarative statements are not promises when they respond to suggestions of governmental entities. Cf. Hamdi, 432 F.3d at 125. The Description section is just that type of language because — although not required by the FCC — it responds to the FCC's concern that telecommunications providers accurately describe their charges to consumers. Report and Order, 12 FCC Red. at 9211 V 855 (indicating that consumers should receive "complete information regarding the nature of the universal service contribution”).

. Although the first sentence does note that AT & T “must pay” the USF, Aplt.App. at 1665, this promise is not directed at the California residential consumers.

. We need not reach AT & T's argument that the district court erred by converting the CSA from an individual agreement with each residential consumer into an agreement with a class of residential consumers. Although AT & T advanced the same general theory in its motions for judgment as a matter of law before the district court, Aplt.App. at 1202 (challenging "plaintiffs' attempt to transform an individual obligation ... into a promise about AT & T's aggregate collection efforts"); id. at 1274 (same), its appeal focuses on new arguments. Thus, I agree with the majority that AT & T forfeited this issue by failing to raise it before the district court. See Maj. Op. at 1208 n. 11.

. A more logical interpretation of the CSG would be to recognize that the specific UCC in the Rates and Charges section restricts or qualifies the meaning of any general promises in the Description section. See Bowmer, 428 N.Y.S.2d 902, 406 N.E.2d at 762. This interpretation would give effect to AT & T's specific promise to charge a UCC based on a certain percentage of the consumer’s total interstate and international bill. This interpretation also would give effect to AT & T's general promise in the Description section (assuming that it can be viewed as such) because it (1) would qualify the promise to collect only those amounts AT & T contributes to the USF by requiring only that AT & T attempt to balance the UCC collections against its USF contributions; and (2) would enable AT & T to amend the UCC calculation methodology, which is necessary to ensure that it collects enough to pay the fluctuating USF contribution and complies with the requirement to impose “just and reasonable” charges under 47 U.S.C. § 201(b).

. Nothing in the CSA or surrounding circumstances indicates that the parties agreed to a term of "many billing cycles," as opposed to some other period of time. In fact, the California residential consumers admit that "a[ny] defined period” could potentially constitute a reasonable period. Aplee. Opening Br. at 59. This ambiguity demonstrates that the parties never agreed on a particular time period over which to balance the collected UCC with AT & T’s USF contributions. See Restatement (Second) of Contracts § 204 cmt. c (1981) ("Where there is tacit agreement or a common tacit assumption or where a term can be supplied by logical deduction from agreed terms and the circumstances, interpretation may be enough. But interpretation may result in the conclusion that there was in fact no agreement on a particular point, and that conclusion should be accepted.... ”).