# United States Court of Appeals
## For the Eighth Circuit
_____

No. 21-3690
_____

United States of America

*Plaintiff - Appellee*

v.

Marlin Santana Thomas

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: September 27, 2022
Filed: January 24, 2023
_____

Before GRUENDER, SHEPHERD, and ERICKSON, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Marlin Thomas appeals his 2021 conviction for various sex-trafficking offenses. He argues that the Government was prohibited from prosecuting him based on a "No Further Prosecution" clause in a prior 2018 plea agreement that resolved heroin-related charges against him. We conclude that the prior plea agreement's promise of no further prosecution encompasses the sex-trafficking

convictions appealed here. We therefore reverse the denial of Thomas's motion to dismiss the indictment and vacate his conviction.

## I.

In May 2018, Thomas pleaded guilty in the Southern District of Iowa to one count of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. In exchange, the Government agreed to dismiss the other four counts of the indictment. The plea agreement also contained a "No Further Prosecution" clause, which stated:

> The Government agrees that Defendant will not be charged in the Southern District of Iowa with any other federal criminal offense arising from or directly relating to this investigation. This paragraph and this Plea Agreement do not apply to (1) any criminal act occurring after the date of this agreement, (2) any crime of violence, or (3) any criminal offense which Defendant did not fully disclose to law enforcement during Defendant's interviews pursuant to any proffer or other agreements with the United States.

Thomas's appeal concerns the scope of this clause, and interpreting it requires background on that earlier case. More specifically, his appeal hinges on whether "any other federal criminal offense arising from or directly relating to this investigation" encompasses the sex-trafficking charges that led to his present conviction.[1]

---

[1]Before the district court, the Government argued that the sex-trafficking charges were "crimes of violence" within the plea agreement's exception. The district court disagreed and declined to deny dismissal on that ground. The Government did not appeal that ruling. Nor does the Government argue on appeal that any of the exceptions apply to permit prosecution of the sex-trafficking offenses. Indeed, the Government conceded at oral argument that the clause's three exceptions are not at issue. We therefore deem any argument that the three exceptions might apply to the sex-trafficking charges waived. *See United States v. Greene*, 513 F.3d 904, 906-07 (8th Cir. 2008) (finding that the government had waived an argument

The federal investigation into Thomas began in early 2018.[2] It was carried out with the assistance of the Des Moines Police Department ("DMPD") following a tip that Thomas was dealing heroin. The principal federal prosecutors were Assistant United States Attorneys ("AUSA") Amy Jennings and Virginia Bruner. At the time, Thomas faced Iowa state charges for human trafficking of a minor, G.M. DMPD interviews with G.M. prior to the federal investigation revealed that Thomas provided drugs to her, had sex with her, and sexually trafficked her using advertisements on Backpage.com, an escort-services website, to arrange hotel meetups with men. By early February 2018, the U.S. Attorney's Office learned of the pending state charges. On February 9, AUSA Bruner served a subpoena on Backpage.com for records related to Thomas based on details learned from the pending G.M. case.

The AUSAs and DMPD officers continued to investigate Thomas's heroin activity. In February, they orchestrated three controlled buys from him. On February 28, DMPD officers, including Todd Wilshusen and Brady Carney, executed a federal search warrant for Thomas's apartment and car. They seized

premised on the plea agreement because it failed to raise the argument in its opening brief).

[2]These facts come from the parties' briefing and exhibits before the district court on Thomas's motion to dismiss the indictment. In addition, Thomas filed a motion arguing that this Court should consider certain transcriptions that his attorneys made from Des Moines Police Department ("DMPD") officer interviews with alleged victims in the sex-trafficking case. The Government had provided audio of these interviews to Thomas during discovery but not the physical recordings themselves, and the interviews were never made part of the record. Thomas included these transcriptions in his briefing before the district court and here in his opening brief. In the alternative, Thomas moved to supplement the record on appeal with the actual interviews. The Government does not object to us considering the limited transcriptions that appear in briefing but objects to any supplementing of the record. We therefore will consider the transcriptions to the extent that the Government did not object—as Thomas requested—but otherwise deny Thomas's motion to supplement the record.

drugs, drug paraphernalia, Thomas's Samsung Galaxy J1 cellphone, and his Samsung Galaxy Note 8 tablet. Officers also discovered G.B., an alleged sex-trafficking victim, in the apartment. Officer Wilshusen interviewed her on the scene. She described buying heroin from Thomas and having sex with him for heroin when she did not have money. Later that day, AUSA Jennings filed a criminal complaint charging Thomas with heroin-related offenses. The complaint made no mention of Thomas's sex-trafficking activity.

In early March 2018, Officer Wilshusen and AUSAs Bruner and Jennings interviewed G.B. about her involvement with Thomas. She again described how she obtained heroin from him and that he often used heroin to exploit her. She said that Thomas had asked to advertise her on Backpage.com and to arrange for her to have sex with customers in hotels. According to G.B., Thomas explained to her that potential customers would talk to him and then he would "set it up with the girls." Reports of these interviews with G.B. were provided to Thomas during discovery in the heroin case.

Relying in part on this interview, Officer Wilshusen obtained a search warrant for the cellphone and tablet seized from Thomas's apartment (ostensibly to search for evidence of drug crimes). In the application for the warrant, Officer Wilshusen described the controlled drug buys and information learned from G.B., namely that G.B. stated she had sex with Thomas for heroin and that Thomas had asked if he could advertise her on Backpage.com as a prostitute.

The cellphone search revealed evidence of sex trafficking and prostitution. Based on that evidence, on March 9, AUSA Bruner served a second subpoena to Backpage.com for records associated with that cellphone number. Backpage.com provided relevant posts and advertisements from January through February 2018 and an email address associated with the cellphone number. AUSA Bruner then used that email address to serve a third subpoena on Backpage.com, yielding more advertisements linked to Thomas.

On March 13, at a preindictment detention hearing for the heroin charges, the Government (represented by AUSA Jennings) pointed to Thomas's pending state human-trafficking charge as a significant reason to deny bond. AUSA Jennings summarized those allegations against Thomas and stated that "it's of particular note that the defendant is alleged to have provided narcotics to this minor as a part of human trafficking, and here we are again, the defendant has sold narcotics in three controlled buys."

After the detention hearing, AUSA Jennings wrote an internal prosecution memorandum proposing an indictment for heroin charges. The memorandum explained that Thomas was arrested on the heroin charges to "get him off the street." AUSA Jennings intended to bring the state human-trafficking charge in federal court "and/or develop a new trafficking case against [Thomas] based on more recent conduct." Finally, in a section addressing "additional investigation," the memorandum stated, "Analyze phones to gather additional evidence regarding heroin and/or HT [human trafficking]."

On March 27, a grand jury returned a five-count indictment for heroin-related offenses. G.B. was one of the witnesses before the grand jury. She described her involvement with Thomas like she had to the officers in earlier interviews. Immediately after the indictment was returned, AUSA Jennings had G.M.—the alleged victim in Thomas's pending state charges—appear before the grand jury to "lock in her testimony." G.M. testified about Thomas's sexual exploitation of her.

The investigation continued. On April 10, DMPD officers obtained a state search warrant for Thomas's cellphone seized from his apartment to search for evidence of sex trafficking. In the application for the warrant, DMPD Officer Michael Westlake recounted information about Thomas's trafficking of G.M. and about Officer Wilshusen's search of Thomas's apartment and his cellphone. The application stated that the earlier search of the cellphone revealed "evidence of human trafficking and prostitution including outgoing and incoming text messages detailing multiple instances of human trafficking and prostitution. This evidence

would be beneficial to Thomas's human trafficking case and could identify other potential victims."

On May 21, 2018, the district court accepted Thomas's plea agreement in the heroin case. For the guilty plea's factual basis, Thomas admitted that in January and February 2018 he conspired to distribute heroin. He specifically admitted to distributing on three occasions in February. He also admitted to having possessed heroin with intent to distribute on February 28, 2018—the day the search warrant for his home was executed. Thomas did not admit to sex-trafficking conduct. AUSA Jennings signed the plea agreement for the Government. There is no indication that the parties specifically negotiated or discussed the precise meaning of the No Further Prosecution clause. The district court sentenced Thomas to 48 months' imprisonment.

Meanwhile, based on the earlier interviews with G.B., DMPD Officer Michael Fong interviewed B.B., an alleged associate of Thomas identified by G.B. B.B. pointed him to K.T., identifying her as a prostitute also involved with Thomas. In June 2018, K.T. gave a proffer interview with AUSA Bruner and Officer Fong. Precisely why they interviewed K.T. is debated. The Government asserts that the interview was conducted as part of an unrelated sex-trafficking case involving two other suspects. On the other hand, Officer Fong testified that the information he learned from B.B. led him to speak to K.T. It is undisputed that as a result of the K.T. proffer interview, Officer Fong searched DMPD records for other complaints about Thomas. This led him to alleged victim S.A., who had made an earlier report that Thomas had sexually assaulted her. Officer Fong, along with AUSAs Jennings and Bruner, then interviewed S.A. about Thomas. In that interview, S.A. identified alleged victim J.W. and suggested that officers contact her because she had also been beaten and trafficked by Thomas.

Following these efforts, DMPD Officer Carney (who was involved with the Thomas investigation at the peak of the heroin case and who participated in the February 2018 apartment search) eventually managed to interview J.W. in 2019.

J.W. also implicated Thomas in heroin distribution and sex trafficking and identified another alleged victim, E.J. Officer Carney interviewed E.J. in 2020. In that interview, Officer Carney described the investigation:

> Once we did the heroin case and we started to talk to people, there were a couple very, very brave young women who, while we were doing the heroin case, kind of told us what was going on, and what happened to them, and how he operated. And so ever since then, we have been working on tracking down people who we knew that he was involved with . . . . [A]nd we fully anticipate to prosecute him in federal court for all of the sex crimes that he committed . . . .

When E.J. asked how Officer Carney had gotten her name, he answered,

> from investigating [Thomas] and we have his cell phones from a couple of years ago of when we recovered them. . . . And to be honest, the focus was at first a kind of drug investigation, and then it was like, holy cow, there is way more to this. And . . . so, yes, I knew a little bit about you from digging into his past and working this case and, then, I'll be honest with you, yes a couple of the girls mentioned, they didn't know exactly who you were, but a couple of girls mentioned you.

Officer Carney's continuing efforts led to three other alleged victims: L.G., K.D., and N.L. His reports state that he located each victim's contact information in Thomas's cellphone that was obtained during the February 2018 apartment search.

That brings us to the current prosecution and appeal. In August 2020, Thomas was indicted on seventeen counts related to sex trafficking, facilitating prostitution, and drug offenses. The seventeen counts corresponded to the eight alleged victims identified above (G.M., G.B., S.A., J.W., E.J., L.G., K.D., and N.L.), some of whom were associated with multiple counts. Count 17 was not tied to a particular victim but alleged a violation of the Travel Act for facilitating prostitution. *See* 18 U.S.C. § 1952(a)(3)(A). It appears to apply to conduct involving several or all the victims. Thomas moved to dismiss the indictment arguing that all counts arose from or directly related to the 2018 investigation and were therefore barred by the 2018 plea

agreement. Before the motion was resolved, the Government voluntarily dismissed Count 13, related to Thomas providing heroin to G.M., and Count 15, related to Thomas providing heroin to G.B. Thus, fifteen counts remained for the district court's consideration on the motion to dismiss.

The district court entered a preliminary order finding that the language of the plea agreement's No Further Prosecution clause—"any other federal criminal offense arising from or directly relating to this investigation"—was ambiguous. It then held an evidentiary hearing to admit parol evidence to determine the scope of that clause. The hearing focused on testimony from the attorneys involved in negotiating the 2018 plea agreement, followed by argument on the motion. Arguing for the Government, AUSA Bruner emphasized that the inquiry should focus on the defendant's "reasonable belief" of the No Further Prosecution clause's scope and that Thomas could not have reasonably believed that the heroin plea deal would shield him against charges for sex trafficking of unrelated victims. Thomas's counsel emphasized the plain language of the plea agreement and that any ambiguities should be construed against the Government.

The district court determined that the plea agreement's reference to "this investigation" meant only a separate heroin investigation. The court characterized it as a standard drug case consisting of three controlled buys and the search of Thomas's apartment. The court then concluded that a reasonable person in Thomas's position would have believed that "this investigation" referred only to the information gathered by the Government related to Thomas's drug activity because the complaint, indictment, and guilty-plea factual basis involved only drug offenses and facts, with no mention of sex-trafficking. As a result, the court denied Thomas's motion as to all counts but one, Count 14, which involved G.B. (who was found in Thomas's apartment when it was searched). Ultimately, Thomas pleaded guilty in 2021 to some of the remaining counts (1, 2, 3, 8, 11, and 16, involving victims E.J., S.A., J.W., L.G., K.D., and N.L., respectively) in exchange for the Government's dismissal of the others. He reserved his right to appeal the denial of his motion to dismiss the indictment with respect to the undismissed fourteen counts. *See* Fed. R.

Crim. P. 11(a)(2). Thomas was sentenced to life imprisonment for each count, to be served concurrently.

## II.

We review a district court's interpretation and enforcement of a plea agreement *de novo*. *United States v. Collins*, 25 F.4th 1097, 1100 (8th Cir. 2022). "We generally interpret the meaning of the terms in the agreement according to basic principles of contract law." *Id.* (brackets omitted). This involves "discern[ing] the intent of the parties as expressed in the plain language of the agreement when viewed as a whole." *United States v. Lara-Ruiz*, 681 F.3d 914, 919 (8th Cir. 2012). But "[a]pplication of these contract principles is tempered by the constitutional implications of a plea agreement." *Margalli-Olvera v. INS*, 43 F.3d 345, 351 (8th Cir. 1994) (interpreting a prior plea agreement's effect on later immigration proceedings). Allowing the government to breach a promise that induced a guilty plea violates due process. *Collins*, 25 F.4th at 1100-01. Accordingly, we construe ambiguities in a plea agreement against the government. *Id.*

### A.

The No Further Prosecution clause provides, in relevant part: "The Government agrees that Defendant will not be charged in the Southern District of Iowa with any other federal criminal offense arising from or directly relating to this investigation." The district court concluded that "this investigation" was ambiguous, referring either to the specific facts supporting the heroin-related charges or to the full set of facts learned by the Government from investigating Thomas in pursuing those charges. We disagree.

The plea agreement does not expressly define "this investigation," so we look to its ordinary, natural meaning. *See Margalli-Olvera*, 43 F.3d at 352. "*Investigation* implies a systematic tracking down of facts and circumstances, typically from a variety of sources, in hopes of putting together an account that

answers, as far as possible, what happened." *Investigation; Inquiry; Inquisition; Probe*, Garner's Dictionary of Legal Usage (3d ed. 2011). Similarly, Black's Law Dictionary defines an investigation as "[t]he activity of trying to find out the truth about something, such as a crime, accident, or historical issue." *See Investigation*, Black's Law Dictionary (11th ed. 2019). These definitions are quite encompassing and capture an unambiguous, familiar concept. In application, that concept, combined with the modifier "this," directs us to examine the particular "activity" or "systematic tracking down" of the particular "facts and circumstances" at issue. Rightly so. Criminal investigations are as varied as defendants' offenses and *modi operandi*. Thus, determining the scope of "this investigation" in the No Further Prosecution clause necessarily entails looking to the facts of that investigation. *See Lara-Ruiz*, 681 F.3d at 921 (applying the plain meaning of "physical violence" to the offenses at issue in the case).

On these facts, "this investigation" refers to the single investigation into Thomas that encompassed his intertwined heroin and sex-trafficking conduct leading up to his May 2018 guilty plea. Indeed, discovery materials shared with Thomas as well as the Government's arguments at the detention hearing included references to sex-trafficking and specific facts that could support federal sex-trafficking charges. To pluck specific facts out of the investigation to arrive at a narrower "investigation" goes against the ordinary meaning of the term, which contemplates a weaving together of facts "from a variety of sources" to "put[] together an account" or "find out the truth" about "what happened." And yet the Government takes just such a piecemeal approach. It treats facts related to Thomas's heroin offenses as belonging to one investigation and facts related to his sex trafficking as belonging to another, even if those facts were obtained from the same witness interviews or from the same searches and seizures of the same devices. In its view, "this investigation" unambiguously refers to a separate heroin investigation.

But the record shows that Thomas's heroin distribution and sex trafficking were intertwined. Thomas provided heroin to his sex-trafficking victims and used the drug's addictive qualities to seduce, control, and exploit them. Our opinion in

Thomas's 2019 appeal of his sentence for the heroin charge recognized as much. *See United States v. Thomas*, 777 F. App'x 180, 180-81 (8th Cir. 2019) (per curiam) ("We further conclude that the district court did not err in imposing an above-Guidelines sentence based on Thomas's prostitution activities, which the court found were 'inextricably intertwined' with his drug offense."). Beginning with the allegations from G.M. and G.B. and the devices seized from the apartment search, state and federal officers working in tandem built a federal sex-trafficking case against Thomas and used the heroin case to "get him off the streets" in the meantime. In short, "this investigation" refers to the one investigation into Thomas, which reflected the inextricably intertwined nature of his conduct.

Accordingly, we are not persuaded by the Government's Ninth Circuit authority interpreting the following no-further-prosecution clause in a plea agreement: "The government agrees that no other charges will be filed against defendant in connection with this investigation." *See United States v. Clark*, 218 F.3d 1092, 1094 (9th Cir. 2000). The Ninth Circuit concluded, based on the four corners of the plea agreement, that "this investigation" unambiguously referred only to the investigation of the defendant's postal robberies and not an unrelated, unmentioned, and uncharged burglary. *Id.* at 1095-97. Yet *Clark* contained no specific discussion of the meaning of "investigation" and how it is inherently derived from the conduct of investigators. *See id.* at 1095-96. We find such analysis necessary here. And crucially, in *Clark* there was "very little evidence of a link between investigations of the two different crimes." *Id.* at 1094. In Thomas's case, the link is unmistakable—the record shows one, overarching investigation.

Our reading of "this investigation" also gives full effect to the various terms of the plea agreement. *Cf. Harris v. The Epoch Grp., L.C.*, 357 F.3d 822, 825 (8th Cir. 2004) ("[U]nder federal common law a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." (internal quotation marks omitted)); *see United States v. Hamdi*, 432 F.3d 115, 123-24 (2d Cir. 2005) (applying to a plea agreement the principle of contract law preferring an

interpretation that does not leave a portion of the contract superfluous).  In addition to "this investigation," the agreement refers to "charges" and "offenses."  These are distinct terms with distinct meanings.  *See United States v. Transfiguracion*, 442 F.3d 1222, 1234 & n.20 (9th Cir. 2006).  Paragraph 2 of the plea agreement addresses the *charges* to be dismissed, whereas paragraph 3 promises no further prosecution of *offenses* "arising from or directly relating to" this *investigation*.  Thus, to read "this investigation" as extending no further than the related heroin charges or offenses risks rendering superfluous a key part of the agreement.  *See United States v. McLaughlin*, 813 F.3d 202, 204 (4th Cir. 2016).  At the very least, it strains a core contractual principle that different language used to address similar issues generally carries different meaning.  *See Larson v. Nationwide Agribusiness Ins.*, 739 F.3d 1143, 1147-48 (8th Cir. 2014) (interpreting Minnesota law); *Owners Ins. v. Fid. & Deposit Co. of Md.*, 41 F.4th 956, 959 (8th Cir. 2022) (applying *Larson*'s reasoning to Missouri contract); *see also* Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) ("[A] material variation in terms suggests a variation in meaning.").  Without compelling reasons to disregard these differences, we are not persuaded by the Government's narrow reading of the plea agreement.

Moreover, even if the facts here left the phrase "this investigation" unclear, the district court was "bound to construe the agreement against the Government"— that is, in the broad sense described above rather than the narrow sense of trying to separate intertwined aspects of the investigation based on the prosecution's subjective goals.  *See United States v. Lewis*, 673 F.3d 758, 763 (8th Cir. 2011).  After all, the Government was in the best position to draft a narrower or more precise agreement.  *See United States v. Harvey*, 791 F.2d 294, 301 (4th Cir. 1986) (noting that the government bears the "primary responsibility for insuring precision in [plea] agreement[s]").  Consider how the Government might have easily limited its side of the bargain.  It could have promised no further prosecution "for the specific conduct described in the indictment or statement of facts." *See United States v. Jordan*, 509 F.3d 191, 196 (4th Cir. 2007); *see also United States v. McClure*, 854 F.3d 789, 795 (5th Cir. 2017) (noting that the plea agreement's promise was limited to offenses

related to the *conduct* supporting the guilty plea rather than the government's *investigation* into that conduct). Or the Government might have limited the range of offenses that it agreed not to prosecute by using language like "the defendant will not be charged with any other *drug* offense" or "any other Title 21 offense." *See Lara-Ruiz*, 681 F.3d at 917. And above all, the Government could have expressly excepted sexual-exploitation offenses from the plea agreement. Indeed, the No Further Prosecution clause already contained three express exceptions. The lack of a fourth to address the looming sex-trafficking offenses further supports the plainly broad scope of the clause. If Thomas would have rejected these narrower terms, the Government could have proceeded to trial. As it is, the plea agreement did not include such limitations, and we are not persuaded by the Government's attempt to insert them after the fact. Thus, we disagree with the district court that "this investigation" was limited to a heroin-related subset of the overall investigation into Thomas.

## B.

Having resolved the reach of "this investigation," the question then is whether any of the fourteen undismissed counts arose from or were directly related to it. The parties largely agree about what "arising from" and "directly relating to" mean. In this context, to *arise* is "[t]o originate; to stem (from)," or "[t]o result (from)." *See Arise*, Black's Law Dictionary. It has a broad meaning. *See McClure*, 854 F.3d at 795 (implying that "arising out of" is broader than "based upon"). "Relating to" is similarly broad. *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (interpreting "relating to" in a federal preemption statute). The parties acknowledge that the word *directly* narrows "relating to" to mean in a "straightforward" manner. *See Directly*, Black's Law Dictionary. Context also informs the reach of "arising from" and "directly relating to." The No Further Prosecution clause covers "any other federal criminal offense." The words "any other" imply that such offenses may arise from or directly relate to the investigation in various manners and directions. Thus, the Government's promise sweeps broadly and stands in contrast

-13-

with the more constrained "in connection with" language of the plea agreement in *Clark*. *See* 218 F.3d at 1094.

We conclude that all undismissed counts "ar[ose] from or directly relat[ed] to this investigation." The same investigation that led to the heroin charges led to the sex-trafficking charges. The two cases shared prosecutors, DMPD officers, witnesses, and subject matter—Thomas's heroin distribution and sex trafficking. Early 2018 victim statements, cellphone searches, and subpoenaed records gave rise to later-identified alleged sex-trafficking victims and corroborated their accounts. The 2020 seventeen-count indictment was therefore the outgrowth of efforts rooted in that early 2018 investigation. Some counts may bear a stronger connection to that investigation than others, but "arising from" and "directly relating to" are sufficiently broad to encompass them all.

To start with the obvious, we find it noteworthy that the indictment included two later-dismissed counts (14 and 15) clearly within the plea agreement's scope. They both involved Thomas's exploitation of G.B., one for heroin and one for sex-trafficking. G.B. was discovered during the heroin search of Thomas's apartment. These counts were clearly precluded by the 2018 plea agreement. Yet the Government nonetheless brought them. It then dismissed the heroin count voluntarily but left the sex-trafficking count. The district court was right to dismiss that sex-trafficking count. The fact that the Government even brought these two counts highlights its misinterpretation and strained reading of the No Further Prosecution clause.

The fourteen undismissed counts present a somewhat closer issue, but they still straightforwardly arise from or directly relate to the 2018 investigation. For Count 12 associated with G.M., the Government became aware of the information supporting this charge during the height of the heroin case when DMPD Officer Wilshusen notified the U.S. Attorney's Office that he had a suspect for heroin charges, who also happened to have a pending state charge for human trafficking. The Government then used the allegations against Thomas at his preindictment

detention hearing. At that time there was no federal sex-trafficking case against Thomas. It would have been plain to all involved—including Thomas during the hearing—that the Government had information supporting such a case and was employing it in the heroin case to keep Thomas off the streets. The details about G.M. cannot be cabined to some separate investigation involving separate people and departments when the record shows otherwise.

As for Counts 1 and 3 through 7, associated with E.J. and J.W., they arose from and directly relate to S.A.'s interview with AUSAs Jennings and Bruner and Officer Fong. S.A. identified J.W., who in turn identified E.J. As for S.A. herself, the alleged victim of Count 2, Officer Fong acknowledged that he became aware of her when his participation in the proffer interview with K.T. prompted him to search for reports about Thomas. Indeed, in a later report, Officer Fong recognized that the sex-trafficking case grew, at least in part, from the early investigation into Thomas: "During 2017 and 2018, through these investigations and through parallel drug and sex trafficking investigations I have received information Thomas has been involved in sexual assault and sex trafficking." These seven counts therefore arose from and directly related to the 2018 investigation.

For Counts 8 through 11 and 16, involving L.G., K.D., and N.L., the link to the investigation is straightforward. Officer Carney's reports state that he located each victim's contact information in Thomas's cellphone that was obtained during the February 2018 apartment search. Indeed, the Government acknowledges that N.L. was located through information from Thomas's cellphone and tablet seized in 2018. The Government maintains, however, that alleged victims L.G. and K.D. were not identified through any information learned from the ongoing investigation rooted in 2018 but through information provided by witnesses first interviewed in 2020. Beyond these bare claims in the Government's opposition brief before the district court, there is no record tracing their separate, independent connection to Thomas's crimes. Further, the Government acknowledges that Backpage.com records linked to Thomas and obtained from the earlier subpoenas corroborated K.D.'s and N.L.'s accounts. As for L.G., the Government is more vague: "Additional investigation

such as phone records and arrest reports provided further information that corroborated her account." But this vagueness is not enough to overcome Officer Carney's reports about finding her contact information in Thomas's cellphone.

That leaves Count 17 involving the Travel Act. It is not tied to a particular victim. There is no indication that the charge relates to Thomas's conduct separate or apart from that which formed the basis for the other counts. We see no reason why it too is not barred by the plea agreement as arising from or directly relating to the investigation in early 2018.

*          *          *

This is a broad result. But it is not surprising. The plea agreement combines the broad language of "arising from or directly relating to" with the broad scope of "this investigation." Against this result, the Government points to the reasonable-belief principle, *see United States v. Olesen*, 920 F.2d 538, 541 n.1 (8th Cir. 1990), and argues that Thomas could not have reasonably believed that he could not be prosecuted for these sex-trafficking offenses. The district court took the Government's view and concluded that "[g]iven the government's policy requiring a plea to the greatest charge, neither a reasonable defense attorney or an AUSA would expect to resolve a human trafficking charge by a sentence forty percent or less of the statutory mandatory minimum." *United States v. Thomas*, No. 4:20-cr-00118, Doc. 59 at 18 (S.D. Iowa Feb. 2, 2021). In hindsight, that may be. But we cannot ignore or reject the plain language of the plea agreement and the full scope of the investigation merely because, in hindsight, we think Thomas received too good of a deal. *See United States v. Rewis*, 969 F.3d 985, 988 (11th Cir. 1992) ("It is not our function to determine if the government made a wise choice in entering into such an agreement, we merely must ensure that plea agreements are followed."); *see also Dunn v. Colleran*, 247 F.3d 450, 464 (3d Cir. 2001) (noting that a prosecutor may not "unilaterally repudiate his or her promises because honoring them becomes distasteful"). Moreover, as we have emphasized here, discovery materials shared with Thomas during the 2018 heroin prosecution included express references to sex-

trafficking and specific facts supporting potential sex-trafficking charges.[3]  The Government would have the reasonable-belief principle do more work than the plea agreement's language can bear—limiting the No Further Prosecution clause's plainly broad terms to the narrower scope of *different* terms in the plea agreement like "indictment," "offense," or "charges" because, in its view, that is what the plea agreement was really about.  We reject that invitation and hold the Government to a greater degree of responsibility than the defendant for the plea agreement's purported imprecisions or ambiguities.  *See United States v. Bowman*, 634 F.3d 357, 360-61 (6th Cir. 2011).

In sum, we conclude that the undismissed counts were squarely barred by the plea agreement's broad No Further Prosecution clause.  We emphasize that this holding is on the facts here—the language of Thomas's plea agreement and the nature of the investigation into his inextricably intertwined drug and sex-trafficking conduct.  Other plea agreements that employ similar language must be construed according to their respective factual contexts.

## III.

Finally, we turn to the question of the appropriate remedy given the Government's breach of the 2018 plea agreement.  There are two potential remedies: specific performance of that agreement or withdrawal of the guilty plea secured by it.  *See Olesen*, 920 F.2d at 540.  Ordinarily, we would remand the question of remedy so that the district court can address it in the first instance.  *See Collins*, 25 F.4th at 1102.  Yet where the defendant has requested specific performance, we have sometimes granted it ourselves.  *See, e.g.*, *Margalli-Olvera*, 43 F.3d at 354-55; *United States v. Mosley*, 505 F.3d 804, 812 (8th Cir. 2007); *United States v. Van*

---

[3]Although we find the plea agreement's language to be unambiguous and therefore need not consider parol evidence, we note that Thomas's counsel understood that the Government would leave the sex-trafficking prosecution related to G.M. with the State of Iowa.  Thomas's counsel also understood "this investigation" to include the information provided by the Government in discovery.

*Thournout*, 100 F.3d 590, 596 (8th Cir. 1996). Where the defendant requests withdrawal of his plea rather than specific performance, we are more inclined to remand the choice to the district court's discretion. *See United States v. Swisshelm*, 848 F.3d 1157, 1159 (8th Cir. 2017). But specific performance remains the preferred remedy. *Margalli-Olvera*, 43 F.3d at 354-55. Thomas seeks specific performance in the form of dismissal of the indictment and vacatur of his conviction. In his case, withdrawal of the 2018 guilty plea in the heroin case would be "an empty remedy" because Thomas has already served his prison sentence for that offense. *See Lara-Ruiz*, 681 F.3d at 923; *see Transfiguracion*, 442 F.3d at 1236 (affirming specific performance of plea agreement's no-further-prosecution clause where the government's breach and prejudice to defendant could not be undone). We therefore turn our focus to Thomas's request for specific performance.

We consider three factors in considering a defendant's demand for specific performance of a plea agreement after the defendant has pleaded guilty: (1) the possible prejudice to the defendant, (2) the conduct of the government, and (3) the public interest. *Hall v. Luebbers*, 341 F.3d 706, 715 (8th Cir. 2003). "Prejudice to the defendant is the most important." *Margalli-Olvera*, 43 F.3d at 355. Here, the prejudice is clear. Thomas pleaded guilty in 2018 to one drug offense in exchange for the Government dismissing the remaining drug offenses and promising not to bring further charges arising from or directly relating to the investigation. The Government reneged on that promise by pursuing the sex-trafficking prosecution, which relied on facts that were part of and arose out of the 2018 investigation. As a result, Thomas faced charges he would not otherwise have faced had the Government stuck to its bargain. His 2021 guilty plea therefore was premised on a nullity. Further, the prosecution's breach of the plea agreement implicates "the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *See Swisshelm*, 848 F.3d at 1159. "Plea agreements are an essential component of the administration of justice . . . ." *United States v. Mitchell*, 136 F.3d 1192, 1194 (8th Cir. 1998). On the other hand, the public also has an interest in safety from criminal behavior and in the prosecution of crimes. But that does not outweigh constitutional

due-process interests, and the Government's breach of the plea agreement violated Thomas's due-process rights. *See Collins*, 25 F.4th at 1100 ("The government's breach of a promise that induced a guilty plea violates due process."). Specific performance is therefore warranted and requires that we reverse the district court's denial of the motion to dismiss the indictment and vacate Thomas's conviction.

## IV.

We do not take lightly vacating a conviction and concurrent life sentences on such heinous offenses. Yet it is our duty to hold the Government to the bargain it made. Thus, for the foregoing reasons, we reverse the district court's denial of Thomas's motion to dismiss the indictment with respect to the undismissed fourteen counts and vacate his conviction.

_____